Filed 11/14/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CENTINELA FREEMAN EMERGENCY MEDICAL ASSOCIATES et al., | ) ) ) | |
| Plaintiffs and Appellants, | ) ) | |
| | ) | S218497 |
| v. | ) ) | Ct.App. 2/3 B238867 |
| HEALTH NET OF CALIFORNIA, INC., et al., | ) ) | |
| | ) | Los Angeles County |
| Defendants and Respondents. | ) | Super. Ct. No. BC449046 |
| _____ | ) | |
| CENTINELA RADIOLOGY MEDICAL GROUP, | ) ) ) | |
| Plaintiff and Appellant, | ) ) | |
| v. | ) ) ) | |
| HEALTH NET OF CALIFORNIA, INC., et al., | ) ) | |
| | ) | Los Angeles County |
| Defendants and Respondents. | ) | Super. Ct. No. BC415203 |
| _____ | ) | |

Both state and federal law require any licensed hospital that has appropriate facilities and qualified personnel to provide emergency medical services or care regardless of a patient's ability to pay. (Health & Saf. Code, § 1317, subds. (a),

1

(b);[1] 42 U.S.C. § 1395dd (b), (h).)  If the patient is an enrollee in a health care service plan,[2] the plan is required by statute to reimburse the emergency service provider for necessary emergency medical services and care.  (§ 1371.4, subd. (b).)  Plans are permitted, however, to delegate this financial responsibility to their contracting medical providers.  (§ 1371.4, subd. (e), hereafter section 1371.4(e).)

In this case, each defendant health care service plan (hereafter Health Plan) delegated its emergency services financial responsibility to its contracting medical providers, three individual practice associations (IPAs).[3]  Allegedly, these three IPAs failed to comply with multiple state financial solvency requirements beginning in 2007, and continuing through each quarter for the following four years, resulting in their failure to reimburse the plaintiff noncontracting service providers for the emergency care that they provided to enrollees of defendant Health Plans.  The noncontracting emergency service providers allege that at the time of delegation and throughout the duration of the delegation contracts between the Health Plans and the IPAs, the Health Plans knew or should have known that these IPAs were insolvent.  The providers further claim that under the

---

[1]     All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2]     Health care service plans are defined in section 1345, subdivision (f).  They are commonly known as health maintenance organizations or HMOs.  (*Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56, 59, fn. 3.)

[3]     "Section 1373, subdivision (h)(6), defines an individual practice association by reference to title 42 United States Code section 300e-1(5), which provides as relevant:  'The term "individual practice association" means a . . . legal entity which has entered into a services arrangement (or arrangements) with persons who are licensed to practice medicine.' "  (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 502, fn. 3 (*Prospect Medical*).)

circumstances, the Health Plans lacked any reasonable expectation that the IPAs would reimburse their emergency service claims. Rather than helping to resolve the growing number of their unpaid claims, the noncontracting emergency service providers allege, the Health Plans simply advised them to continue submitting their claims to the insolvent IPAs. The IPAs eventually went out of business. Plaintiff providers then brought actions seeking reimbursement from the Health Plans.

We granted review to consider whether a health care service plan's delegation of its financial responsibility to an IPA or other contracting medical provider group pursuant to section 1371.4(e) relieves it of any obligation to pay providers' claims for covered emergency services and care or if, as plaintiffs contend, a health care service plan has a common law tort duty to noncontracting emergency service providers to act reasonably in making an initial delegation and a continuing tort duty to protect such noncontracting providers from financial harm resulting from any subsequent insolvency of its delegate.[4] We conclude that a health care service plan may be liable to noncontracting emergency service providers for negligently delegating its financial responsibility to an IPA or other contracting medical provider group that it knew or should have known would not be able to pay for emergency service and care provided to the health plan's enrollees. We further conclude that a health care service plan has a narrow

---

[4] In addition to the briefs of the parties, we have received a number of amicus curiae briefs. The California chapter of the American College of Emergency Physicians and the California Medical Association have filed briefs in support of plaintiffs. Counsel for the California Association of Health Plans and CAPG (formerly known as the California Association of Physicians Groups) have filed briefs in support of defendants. We requested and received an amicus curiae brief from the California Department of Managed Health Care.

continuing common law tort duty to protect noncontracting emergency service providers once it makes an initial delegation of its financial responsibility. Specifically, a health care service plan may be liable to noncontracting emergency service providers for negligently continuing or renewing a delegation contract with an IPA when it knows or should know that there can be no reasonable expectation that its delegate will be able to reimburse noncontracting emergency service providers for their covered claims.

A brief summary of the factual and procedural background of this matter and a general overview of the statutory and regulatory backdrop provides context for the parties' contentions and our conclusions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The consolidated appeal in this matter involved two related actions. In the *Centinela Freeman* action, four California partnerships of emergency room physicians (hereafter Centinela Freeman), sued various health care service plans and three IPAs (known collectively as La Vida) to which the plans delegated their financial responsibilities to pay emergency service claims.[5] In the *Centinela*

---

[5]     Plaintiffs in the *Centinela Freeman* action are Centinela Freeman Emergency Medical Associates, Sherman Oaks Emergency Medical Associates, Valley Presbyterian Emergency Medical Associates, and Westside Emergency Medical Associates.

Defendant Health Plans in the Centinela Freeman action are Health Net of California, Inc., Blue Cross of California, PacifiCare of California, California Physicians' Service, Cigna Healthcare of California, Inc., Care 1st Health Plan, and Aetna Health of California, Inc.

As the Court of Appeal recognized, "[t]he precise names of the three La Vida entities are unclear. They were named as: (1) La Vida Medical Group & IPA, doing business as La Vida Prairie Medical Group; (2) La Vida Multispecialty Medical Centers, Inc.; and (3) Prairie Medical Group, Inc. However, when the first La Vida entity answered the initial complaint, it indicated its actual name was La Vida Medical Group, Inc."

4

*Radiology* action, Centinela Radiology Medical Group (hereafter Centinela Radiology), a partnership of radiologists who provided emergency and nonemergency radiology services to enrollees of various health care service plans, filed a nearly identical complaint against the three La Vida IPAs and the same plans sued in the *Centinela Freeman* action.**6**

According to both complaints, none of the plaintiff medical groups contracted with La Vida or any of the Health Plans for the provision of services, but each had provided covered emergency services and care to the Health Plans' enrollees who were assigned to La Vida. Plaintiffs alleged that they sought reimbursement for their services and care from La Vida because defendant Health Plans had delegated their responsibility to pay covered claims to La Vida, but La Vida either did not pay or did not fully pay their claims.

As relevant here, both complaints set forth a negligence cause of action alleging that the Health Plans are responsible for payment of plaintiffs' claims, despite their delegation of financial responsibility to La Vida, because at the time of the Health Plans' delegation to La Vida and throughout the duration of those

---

**6** Centinela Radiology's complaint initially did not include California Physicians' Service as a defendant. Although not entirely clear from the record, it appears that California Physicians' Service may have been added by amendment, as well as an additional health plan, SCAN Health Plan.

Centinela Radiology's complaint sought reimbursement from the Health Plans for services provided on both an emergency and nonemergency basis. On appeal, however, the Court of Appeal observed that Centinela Radiology appeared to focus solely on the emergency services provided by its members and the court expressly limited its opinion to plaintiffs' negligence claims for a failure to pay for compulsory services provided on an emergency basis. Likewise, our grant of review, and therefore our conclusions, are limited to a health care service plan's duty of care to noncontracting emergency service providers who provide, under statutory compulsion, emergency care to the plans' enrollees.

delegation contracts, the Health Plans "knew or should have known" of La Vida's insolvency and yet the Health Plans negligently delegated and continued to delegate their payment obligations to La Vida.[7] According to the complaints, the three La Vida IPAs failed to comply with multiple state financial solvency requirements beginning in 2007, and continuing through each quarter for the next four years, resulting in their failure to pay the plaintiff noncontracting service providers for the emergency care that they provided to enrollees of defendant Health Plans during this time. The complaints alleged that instead of "helping to resolve" the increasing number of unpaid claims by emergency providers, the Health Plans advised plaintiffs to continue submitting claims directly to La Vida and continued their insufficient capitation payments[8] to La Vida, despite the

[7] The complaints also allege causes of action for quantum meruit, unfair competition, open book account, and services rendered. Only plaintiffs' negligence cause of action is at issue before us. As noted, plaintiffs allege in their negligence cause of action that the Health Plans knew or should have known "at the time" of delegation and "throughout the duration" of the contracts of La Vida's insolvency and inability to pay. The complaints do not clearly allege when La Vida became insolvent and unable to pay emergency service claims, although it is alleged that starting in 2007 La Vida failed to comply with multiple state financial solvency requirements. The complaints do not clearly allege when the Health Plans first entered into their delegation contracts with the three La Vida entities. But from the quoted language, and contrary to the assertion of the Health Plans, it appears plaintiffs have alleged a cause of action for negligence on both a theory of negligent initial delegation and a theory of negligent continuation of delegation. We consider both theories.

[8] Capitation payments are made in connection with a risk-sharing arrangement between a health plan and a contracting medical provider under which the provider receives compensation on a "capitated basis." " '[C]apitated basis' " is defined by regulation to mean "fixed per member per month payment or percentage of premium payment wherein the provider assumes the full risk for the cost of contracted services without regard to the type, value or frequency of services provided." (Cal. Code Regs., tit. 28, § 1300.76, subd. (d).)

6

absence of any reasonable expectation that La Vida would reimburse plaintiffs. The Health Plans, it was alleged, knew La Vida was in financial trouble through their receipt of financial reports and other information, including an advisement in October 2009 that La Vida's lender had filed a petition for relief under the bankruptcy laws and had withdrawn $4 million dollars from La Vida's account, and that La Vida was unable to obtain funding from capital markets. The complaints alleged that defendant Health Plans waited until May and June 2010, years after La Vida began openly demonstrating financial instability, to finally discontinue their capitation payments to La Vida and terminate their delegation contracts. La Vida went out of business shortly thereafter.

The Health Plans demurred to the complaints. They contended that once they delegated to La Vida their statutory obligation to reimburse emergency care providers for emergency services, as permitted by section 1371.4(e), plaintiffs had no recourse against them for payments that La Vida was unable to make. As to plaintiffs' negligence cause of action, the Health Plans argued that under the seminal case of *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*), they owed third party plaintiffs no common law duty of care to protect their financial interests.

The trial court sustained defendants' demurrers without leave to amend and entered judgment in favor of defendant Health Plans. Both Centinela Freeman and Centinela Radiology appealed, and the cases were consolidated.

The Court of Appeal concluded that plaintiffs had properly pleaded, or could plead, a cause of action for negligent initial delegation and a cause of action for negligent failure to reassume the delegated financial obligation, that is, a violation of the Health Plans' continuing duty of care. Therefore, it reversed the judgment. We granted defendant Health Plans' petition for review.

7

## II. STATUTORY AND REGULATORY BACKGROUND

Health care service plans are governed by the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act or Act). (Health & Saf. Code, § 1340 et seq.) The Knox-Keene Act "is 'a comprehensive system of licensing and regulation' [citation], formerly under the jurisdiction of the Department of Corporations (DOC) and presently within the jurisdiction of the Department of Managed Health Care (DMHC) (§ 1341; Stats. 1999, ch. 525, § 1(a); Stats. 2000, ch. 857, §§ 19, 100)." (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 155, fn. 3 (*California Medical*); accord, *Prospect Medical*, *supra*, 45 Cal.4th at p. 504.)

The intent and purpose of the Legislature in enacting the Knox-Keene Act was "to promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan." (§ 1342.) The Legislature sought to accomplish this purpose by, among other things, (1) "transferring the financial risk of health care from patients to providers" in order to "[h]elp . . . ensure the best possible health care for the public at the lowest possible cost," (2) imposing "proper regulatory procedures" in order to "[e]nsur[e] the financial stability" of the system, and (3) establishing a system that ensures health care service plan "subscribers and enrollees receive available and accessible health and medical services rendered in a manner providing continuity of care." (*Id.*, subds. (d), (f), & (g).)

Section 1342.6 reiterates the Act's purpose of providing "high-quality health care coverage in the most efficient and cost-effective manner possible," and finds that "it is in the public interest to promote various types of contracts between public or private payers of health care coverage, and institutional or professional providers of health care services." Among the contracts the Act permits are

8

"contracts that contain incentive plans that involve general payments, such as capitation payments, or shared-risk arrangements." (§ 1348.6, subd. (b).) The Act expressly allows contracts in which health care service plans delegate to the plans' contracting medical providers the plans' financial responsibility to reimburse emergency service providers' claims. (§ 1371.4(e).) Noncontracted emergency service providers are entitled to reimbursement at the reasonable and customary rate for the emergency services they perform. (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B).)

Allowing health care service plans to shift to their contracting medical providers the financial risk associated with the provision of medical care carries with it a risk that the providers will at some point become financially insolvent. Over time the Legislature became concerned with the increasing number of provider groups, including IPAs, that had assumed the financial risk for the medical care of plan enrollees under capitation payment contracts with plans and that had subsequently declared bankruptcy. (*Department of Managed Health Care* (Winter 2001) vol. 17, No. 2, Cal. Reg. L.Rptr. 28, 29.) The bankruptcies left "physicians unpaid for medical services already rendered and patients stranded and forced to change physicians." (*Ibid.*) The state had no basis to intervene because, at that time, there were no statutory or regulatory provisions governing the provider groups or their contracts with the plans. (*Id.* at p. 30.)

In 1999, the Legislature addressed this fiscal solvency crisis through the passage of Senate Bill No. 260. (Stats. 1999, ch. 529 (1999-2000 Reg. Sess.) (Sen. Bill No. 260) § 1.) Senate Bill No. 260 created the Financial Solvency Standards Board. (§ 1347.15, subd. (a), added by Stats. 1999, ch. 529, § 1, pp. 3666-3667.) The purpose of the board is to (1) advise the director of the DMHC "on matters of financial solvency affecting the delivery of health care services[,]" (2) "[d]evelop and recommend . . . financial solvency requirements

9

and standards relating to plan operations, plan-affiliate operations and transactions, plan-provider contractual relationships, and provider-affiliate operations and transactions[,]" and (3) "[p]eriodically monitor and report on the implementation and results of the financial solvency requirements and standards." (§ 1347.15, subd. (b)(1)-(3).)

Senate Bill No. 260 also added statutory provisions (§§ 1375.4, 1375.5, 1375.6) that regulate contracts between health care service plans and provider groups, including IPAs, which are now collectively referred to as "risk-bearing organizations" (RBOs). (§ 1375.4, subd. (g).) Notably, section 1375.4 specifies contract provisions concerning the RBOs' administrative and financial capacity that must be included in every risk arrangement contract between an RBO and a health care service plan. (§ 1375.4, subd. (a).) Section 1375.5 provides that any delegation of financial risk in a contract between a plan and an RBO must first be negotiated and agreed to between them. Section 1375.4 requires the DMHC to periodically evaluate contracts between plans and RBOs "to determine if any audit, evaluation, or enforcement actions should be undertaken" by the DMHC. (§ 1375.4, subd. (c).) In addition, the DMHC must adopt regulations that, at a minimum, (1) create a process for reviewing or grading RBOs based on specific criteria concerning their financial viability, (2) mandate disclosure of certain risk assessment information to RBOs by health care service plans, (3) require reporting to the DMHC by both the health care service plans and RBOs, (4) provide for DMHC audits, and (5) institute a process for corrective action plans. (§ 1375.4, subd. (b)(1)-(4).)

The DMHC has adopted regulations complying with these directives. (Cal. Code Regs., tit. 28, § 1300.75.4 et seq.; hereafter all cites to "Regulations" are to tit. 28 Cal. Code Regs. Regulations § 1300.75.4 et seq. are commonly known as the "Solvency Regulations.") Through the method of requiring terms

10

and provisions to be included in every contract involving a risk arrangement between a health care service plan and an RBO, the Solvency Regulations require plans to provide to their RBOs at specified frequencies detailed risk arrangement disclosures, including (but not limited to) information about the group or individual members delegated to the RBO, the type of risk arrangement, "a matrix of responsibility for medical expenses," "projected utilization rates" and "costs for each major expense service group," and "all factors used to adjust payments or risk-sharing targets." (*Id.*, § 1300.75.4.1, subd. (a).) By the same method, the Solvency Regulations require contracting RBOs to report to the DMHC, on a quarterly and annual basis, information regarding the RBO's organization and detailed statements of compliance, or lack thereof, with multiple fiscal solvency requirements and grading criteria. (*Id.*, § 1300.75.4.2; see also § 1375.4, subd. (a)(1) [requiring RBOs to furnish financial information to the plans].) Health care service plans must also provide quarterly and annual reports to the DMHC concerning their contracted RBOs. (Solvency Regs., § 1300.75.4.3.) RBOs must notify the DMHC and each of its contracting plans (and each plan must also independently notify the DMHC) any time the RBO experiences "any event that materially alters its financial situation or threatens its solvency."
(*Id.*, §§ 1300.75.4.2, subd. (f); -1300.75.4.3, subd. (e).)

In addition to imposing these reporting requirements, the Solvency Regulations provide that every contract involving a risk arrangement between a health care service plan and an RBO must include a provision that requires the RBO to permit the DMHC to examine its books and records and to comply with the DMHC's review and audit process. (Solvency Regs., §§ 1300.75.4.2, subd. (g), 1300.75.4.7, subd. (a)(1).) Each contract must permit the DMHC to "[o]btain and evaluate supplemental financial information" from the RBO under described circumstances where the RBO's financial situation may be impacting its

11

performance. (*Id.*, § 1300.75.4.7, subd. (a)(2).) And, every plan must have adequate procedures in place to ensure that it undertakes appropriate review of its RBOs' reported financial status and appropriate action in the event of any notification by the DMHC of a deficiency by an RBO. (*Id.*, § 1300.75.4.5, subd. (a)(1)-(3).)

A health care service plan is subject to disciplinary action for any failure to comply with section 1375.4 and the Solvency Regulations. (Solvency Regs., § 1300.75.4.5, subd. (d).) And the DMHC "may seek and employ any combination of remedies and enforcement procedures provided under the Knox-Keene Act to enforce" section 1375.4 and the Solvency Regulations. (*Id.*, § 1300.75.4.5 subd. (e).)

One of the most important Solvency Regulations, for purposes of the issue before us, is section 1300.75.4.8 governing corrective action plans (CAPs). A CAP is designed to correct any financial solvency or claims payment deficiencies experienced by an RBO. (§ 1375.4(b)(4); Solvency Regs., § 1300.75.4, subd. (g).) RBOs that have such deficiencies must self-initiate a CAP proposal and submit it to the DMHC and to every health care service plan with which it has a contractual risk arrangement.[9] (*Id.,* § 1300.75.4.8, subd. (a).) The CAP must identify all of the health care service plans with which the RBO has risk arrangement contracts, state all of the RBO's deficiencies (including failure to meet DMHC grading criteria regarding payment of claims), describe the actions the RBO has taken or will take to correct them, include a timeframe for completing the corrective action,

---

[9]     In addition to self-initiated CAPs, the DMHC "may direct [an RBO] to initiate a CAP whenever [it] determines that [the RBO] has experienced an event that materially alters its ability to remain compliant with the Grading Criteria." (Solvency Regs., § 1300.75.4.8, subd. (k).)

12

and specify a schedule for submitting progress reports to the DMHC and its contracting health plans. (*Ibid*.; see *id.*, § 1300.75.4.2, subd. (b)(1)(B), (2)(A).)

Health care service plans have a limited period of time to object and propose revisions to the RBO's CAP. (Solvency Regs., § 1300.75.4.8, subd. (c).) If objections are filed, the RBO may submit a revised CAP, to which the health care service plan may again object and propose revisions. (*Id.*, § 1300.75.4.8 subds. (d), (e).) Differences are to be discussed and reconciled, if possible, at a settlement conference held by the DMHC. (*Id.*, § 1300.75.4.8 subd. (f).)

The DMHC approves, disapproves, or modifies the CAP, which then becomes the final CAP. (Solvency Regs., § 1300.75.4.8, subds. (g), (h), (i); see § 1375.4, subd. (b)(4) [in the event the RBO and health care service plans fail to agree on the terms of the CAP, the DMHC shall determine them].) Health care service plans must "cooperate [i]n the implementation of a final CAP." (Solvency Regs., § 1300.75.4.5, subd. (a)(4).) Plans must advise the DMHC if they become aware of its RBO's failure to comply with the final CAP. (*Id.*, § 1300.75.4.5, subd. (a)(5).) A plan's ability to transfer plan enrollees from an RBO that is compliant with a final CAP is restricted. (*Id.*, § 1300.75.4.5 subd. (a)(6).)

In addition to addressing the RBO fiscal solvency crisis by these measures, the Legislature, in 2000, added a requirement that health care service plans provide a "fast, fair, and cost-effective" provider claims dispute resolution mechanism and to make such mechanism "accessible to noncontracting providers for the purpose of resolving billing and claim disputes." (§ 1367, subd. (h), as amended by Stats. 2000, ch. 825 (1999-2000 Reg. Sess.) § 2, p. 5712.)

The Solvency Regulations, however, do not prevent a health care service plan from taking action to terminate its risk arrangement contract with an RBO that is fiscally unsound prior to the approval of a final CAP. The Solvency Regulations specifically require that every contract involving a risk arrangement

13

between a plan and an RBO must provide that the RBO's "failure to substantially comply with the contractual" provisions required by the Solvency Regulations "shall constitute a material breach of the risk arrangement contract." (Solvency Regs., § 1300.75.4.5, subd. (b).) Thus, for example, a plan that determines the financial difficulties encountered by its RBO are of such a magnitude that restoration of its financial solvency cannot reasonably be anticipated through the adoption of a final CAP has the option of refusing to engage in the CAP approval process, terminating its contract with the RBO, and either delegating its financial responsibility to a different RBO or reassuming the obligation to pay emergency service providers for necessary emergency medical services and care.

This statutory and regulatory landscape nevertheless failed to eliminate concern about the payment of provider claims, especially payment of the claims of emergency service providers. In 2001, the Legislature attempted to address this issue by amending section 1371.4 to require health care service plans to pay emergency service providers on a fee-for-service basis if their delegated RBO failed to pay. (Sen. Bill No. 117 (2001-2002 Reg. Sess.) § 2, subd. (f) (Senate Bill No. 117).) The Governor, however, vetoed Senate Bill No. 117. After noting the already existing financial solvency and accountability laws, he stated in part: "SB117 would adversely affect HMO patient care by injecting the government into allowing or prohibiting delegated risk arrangements between HMOs and physician groups based upon the type of service. This bill would also likely result in increased premiums by removing the financial incentives currently in place to reduce unnecessary emergency room utilization and a disincentive to provide preventive and non-emergency urgent care." (Governor's veto message to Sen. on Sen. Bill No. 117 (Oct. 10, 2001), Sen. J. (2001-2002 Reg. Sess.) p. 3083.)

In summary, the Knox-Keene Act contemplates and encourages the delegation by health care service plans to their RBOs of the plans' responsibility

14

to pay emergency service providers' claims as part of a managed health care model.  A complex statutory and regulatory system has been put in place to set financial solvency standards for RBOs, require reporting of financial and risk assessment information between plans and RBOs and to the DMHC, monitor compliance of RBOs with the solvency standards, and correct deficiencies by RBOs in meeting their obligations, primarily through the CAP process.  Plans play a critical role in this scheme.  Noncontracting emergency service providers, however, have virtually no role.  They must, nevertheless, continue to provide emergency services under compulsion of federal and state law.  (§ 1317, subds. (a), (b); 42 U.S.C. § 13955dd. (a), (h).)

### III. PLAINTIFFS' ASSERTED CAUSE OF ACTION FOR NEGLIGENCE

#### A.  Standard of Review

The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled.  " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.  [Citation.]  We also consider matters which may be judicially noticed."  [Citation.]  Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  [Citation.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment . . . .' "  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126, quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  " 'The burden of proving such reasonable possibility is squarely on the plaintiff.' "  (*Ibid.*)  Our examination of the complaint is de novo.  (*McCall v. PacifiCare of Cal. Inc.* (2001) 25 Cal.4th 412, 415.)

15

**B. A Cause of Action Arising from the Statutory and Regulatory Provisions**

Plaintiffs concede that they have no "per se cause of action" against the Health Plans under the Knox-Keene Act because the Act permits health care service plans to delegate to IPAs and other RBOs their financial responsibility to pay emergency service providers. (§ 1371.4(e).) As explained by *Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782 (*Ochs*) and *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127 (*California Emergency Physicians*), the statutory language permitting " 'delegation' " indicates that the obligation is not a "nondelegable" duty for which the plans must retain ultimate responsibility. (*Ochs*, *supra*, at pp. 789-790; *California Emergency Physicians*, *supra*, at pp. 1131-1132.) The legislative history of section 1371.4(e) also reflects the intent to absolve health care service plans of any statutory liability to pay in the event the delegated IPA or other RBO becomes insolvent. (*Ochs*, *supra*, at pp. 790-792; *California Emergency Physicians*, *supra*, at pp. 1132-1133.) Indeed, the legislative understanding that a residual duty to pay is not included in the existing provisions of the Knox-Keene Act is demonstrated by the Legislature's approval and the Governor's veto of Senate Bill No. 117 in 2001, which, as we have noted earlier, would have added a specific requirement that plans pay emergency service providers if their contracted IPAs did not. (*Ochs*, *supra*, at pp. 791-792; *California Emergency Physicians*, *supra*, at p. 1132.) Finally, legislative intent against imposing statutory liability can be discerned in the contrast of section 1371.4(e), which allows the transfer of the financial risk of emergency care to IPAs or other RBOs, with other statutory provisions in which the Legislature has expressly precluded plans from transferring to RBOs the financial risk of certain other treatments and medical services. (§ 1375.8, subd. (b)(2)(A)-(F).) Under the

16

Knox-Keene Act, health care service plans are not statutory guarantors of their contracted IPAs' financial obligations (see *California Medical*, *supra*, 94 Cal.App.4th at pp. 160-167) and no duty of care arises from its provisions.

Plaintiffs argue, however, that a health care service plan has a duty under section 1300.71, subdivision (e)(6) of the DMHC's regulations to reassume payment obligations when its delegate fails to pay a provider's claims. (Regs., § 1300.71, subd. (e)(6), hereafter Regulations section 1300.71(e)(6).)

Regulations section 1300.71(e) concerns claims settlement practices that expressly permits health care service plans to "contract with a claims processing organization for ministerial claims processing services or contract with capitated providers that pay claims" subject to certain described conditions. (Regs., § 1300.71, subd. (e).) Among the specified conditions is a requirement that the claims processing contract "include provisions *authorizing* the plan to assume responsibility for the processing and timely reimbursement of provider claims in the event that the claims processing organization or the capitated provider fails to timely and accurately reimburse its claims." (*Id.*, § 1300.71 (e)(6), italics added.) But plaintiffs point to later language in the same subdivision that states "[t]he plan's *obligation* to assume responsibility for the processing and timely reimbursement of a capitated provider's provider claims may be altered" by an approved CAP. (*Ibid.*, italics added.) From the regulation's use of the term "obligation" in this latter provision, plaintiffs would have us conclude that the DMHC intends health plans to pay them if the health plans' contracted IPA or other RBO does not.

Plaintiffs read subdivision (e)(6) of Regulations section 1300.71 in isolation. But regulations, like statutes, must be read as a whole and construed in context, keeping the regulatory purpose in mind. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [stating the rule of

17

construction for statutes]; *Cal Drive-In Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 292 [noting that the same rules of construction and interpretation apply to regulations of administrative agencies]; *Diablo Valley College Faculty Senate v. Contra Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1037 [same].) When we read Regulations section 1300.71 as a whole, we are not persuaded that Regulations section 1300.71 (e)(6) addresses a health care service plan's duty in the event of the insolvency of its delegated IPA or other RBO. Rather, Regulations section 1300.71 is directed at the process for and timing of submission and settlement of providers' claims. (E.g., Regs., § 1300.71, subd. (b) [Claim Filing Deadline]; *id.*, subd. (c) [Acknowledgement of Claims]; *id.*, subd. (d) [Denying, Adjusting or Contesting a Claim and Reimbursement for the Overpayment of Claims]; *id.*, subd. (g) [Time for Reimbursement]; *id.*, subd. (h) [Time for Contesting or Denying Claims]; *id.*, subds. (i) & (j) [interest and penalties for late payment of claims].) The apparent purpose of Regulations section 1300.71(e)(6) is the further promotion of accurate and timely claims processing and settlement, and nothing suggests that the DMHC intended to address by this provision, buried in a regulation concerning claims processing, the broader question of a health plan's ultimate responsibility to pay in the event of its delegate's financial insolvency.

Moreover, even if the regulation could be construed otherwise, "[a]n administrative agency cannot by its own regulations create a remedy which the Legislature has withheld. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1389; see *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 793 (*Desert Healthcare*) [A negligence duty of care cannot be created through administrative regulations]; *Cal. Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 116, 1175-1176 [same].) A statutory remedy for unpaid emergency service

18

providers has been withheld by the Governor's veto of Senate Bill No. 117 in 2001.

### C. A Cause Of Action For Negligent Initial Delegation

The *Centinela Freeman* and *Centinela Radiology* complaints allege, however, that the Health Plans are liable under common law tort principles of negligence because at the time of their initial delegation of their financial responsibility to pay emergency service claims to La Vida they knew or should have known that La Vida was insolvent and unable to pay those claims.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 (*Bily*); accord, *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 (*Beacon Residential*).)

The Health Plans rely in part on the statutory and regulatory scheme in arguing that the alleged common law duty does not exist. First, they assert that the provisions of the Knox-Keene Act, with its implementing regulations, which recognize and permit negotiated risk-shifting contracts between health care service plans and IPAs and other RBOs under specified contract terms and conditions, necessarily preclude the recognition of a common law duty. (E.g., §§ 1348.6, subd. (b), 1375.4, 1375.5, 1375.6; Solvency Regs., §§ 1300.75.4.1, 1300.75.4.2, 1300.75.4.5, 1300.75.4.7, 1300.75.4.8.) Although the Act and the regulations contain detailed provisions governing the relationship of plans and IPAs under such contracts, neither the Act nor the regulations speak to a health care service plan's responsibility, if any, to noncontracting emergency service providers in

19

entering into a relationship with an IPA or other RBO wherein the plan makes a delegation of its financial responsibility to pay for emergency services pursuant to section 1371.4(e).

Second, the Health Plans point to section 1371.25, which precludes *vicarious* liability by providing, in relevant part, that "[a] plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others." However, section 1371.25 further provides that "[n]othing in this section shall preclude a finding of liability on the part of a plan, any entity contracting with a plan, or a provider, based on the doctrines of equitable indemnity, comparative negligence, contribution, or other statutory or common law bases for liability." Thus, if a health care service plan owes a duty of care to noncontracting emergency service providers under the common law in initially contracting with an IPA or other RBO, section 1371.25 does not preclude a finding of negligence liability on the part of the plan for its own conduct in breaching its duty and proximately causing injury. We turn to the question of whether health care service plans owe such a duty of care.

Because the statutory and regulatory scheme does not preclude the existence of a duty, we consider whether general tort principles lead to a duty in these circumstances. Although "[r]ecognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law[,] [p]rivity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58 (*Quelimane*).) The test for determining the existence of such an exceptional duty to third parties is set forth in the seminal case of *Biakanja*, *supra*, 49 Cal.2d at page 650, as follows: "The determination

20

whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm."

The first *Biakanja* factor focuses on "the extent to which the transaction was intended to affect the plaintiff." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) We have stated that liability for negligent conduct may be imposed "where there is a duty of care owed by the defendant to the plaintiff *or to a class of which the plaintiff is a member*." (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803, italics added; see *Beacon Residential*, *supra*, 59 Cal.4th at p. 586.)[10] Here, plaintiff

---

[10] Two previous cases have rejected negligence claims asserted by emergency service providers against health care service plans on the basis of the inability of the emergency service providers to satisfy this first factor, but those cases failed to recognize that the duty of care may be owed *to a class* of which the plaintiff is a member. *Desert Healthcare*, *supra*, 94 Cal.App.4th at page 792, reasoned that "[t]he conduct alleged to have been negligent must have been intended to affect that particular plaintiff, rather than just a class of persons to whom the plaintiff happens to belong." And, "[t]he failure to show a particularized effect precludes a finding of a special relationship giving rise to a duty, because, to the extent the plaintiff was merely affected in the same way as other members of the plaintiff class, the case is nothing more than a traditional products liability or negligence case in which economic damages are not available." (*Ibid.*) The reviewing court in *California Emergency Physicians* agreed. (*California Emergency Physicians*, *supra*, 111 Cal.App.4th at pp. 1135-1136.) However, as the court in *Ochs* recognized, the rule is not so restrictive. (*Ochs*, *supra*, 115 Cal.App.4th at pp. 797-798.) *Desert Healthcare Dist. v. PacifiCare FHP, Inc.*, *supra*, 94 Cal.App.4th 781and *California Emergency Physician Medical Group v. PacifiCare of California*, *supra*, 111 Cal.App.4th 1127, are disapproved to the extent they are inconsistent with this opinion.

21

noncontracting emergency service providers are a specific and well-defined class, which was reasonably identifiable by their practice specialization, hospital affiliation, and geographic location at the time that the Health Plans negotiated and included a delegation term in their contracts with La Vida. Although the contracts between the Health Plans and La Vida may have broadly covered all health care services rendered for the Health Plans' enrollees, the specific contractual delegation of the Health Plans' statutory obligation to reimburse emergency service providers for their emergency services and care (§ 1371.4, subds. (b), (e)) was necessarily intended to have an effect on plaintiffs. Before the delegation, plaintiffs could seek reimbursement directly from the Health Plans for their compulsorily provided emergency services. As a direct result of the delegation contracts, however, plaintiffs were forced to submit their claims to La Vida, who was responsible for reimbursing, contesting, or denying the claims in a timely fashion. If La Vida failed in its processing or payment responsibilities, plaintiffs' statutory recourse was limited to action against La Vida.

These circumstances distinguish these actions from the two cases on which the Health Plans place heavy reliance in arguing that this first *Biakanja* factor is not met. In *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, we concluded that an escrow company did not owe a duty of care to the plaintiff assignee of a promissory note that was to be paid as part of a refinance transaction. (*Id.* at pp. 707-708, 715.) In considering the first factor identified in *Biakanja*, we found the escrow transaction " 'was not intended to affect or benefit' " the plaintiff and " 'any impact that [the] transaction may have had on [the plaintiff] was collateral to the primary purpose of the escrow.' " (*Summit Financial,* at p. 715.) In *Goodman v. Kennedy* (1976) 18 Cal.3d 335, we concluded that an attorney for officers of a corporation did not owe a duty of care to the plaintiff purchasers of stock from the corporate officers. (*Id.* at pp. 339,

22

344.) We found "[a]ny buyers' 'potential advantage' from the possible purchase of the stock 'was only a collateral consideration' " to the attorney's advice to the corporate officers regarding their sale of stock. (*Id.* at p. 344.) In contrast, the Health Plans' delegation to La Vida under section 1371.4(e) was specifically intended to change who was responsible to reimburse plaintiffs for their covered services. The impact on plaintiffs cannot be characterized as "collateral" to the delegation.

The second *Biakanja* factor considers the foreseeability of harm to the plaintiffs. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Assuming as true for purposes of demurrer plaintiffs' allegations that the Health Plans knew or should have known at the time of entering into the contracts with La Vida that La Vida was insolvent, it is not difficult to conclude that the Health Plans could have reasonably anticipated that La Vida would be unable to pay noncontracting emergency service providers' claims for services and care provided to their enrollees. It was readily foreseeable that shifting the risk of processing and paying any subsequently incurred emergency service claims to La Vida under such circumstances was likely to result in harm to plaintiffs.

There is no real dispute that plaintiffs have suffered actual injury and thus, meet the third *Biakanja* factor. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Plaintiffs allege that they submitted their claims to La Vida and La Vida either did not pay or did not fully pay their claims and now has gone out of business.

The fourth factor is "the closeness of the connection between the defendant[s'] conduct and the injury suffered." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Here, it is clear that La Vida's financial difficulties and insolvency must be considered the immediate and direct cause of plaintiff's economic injury. However, it was the Health Plans' delegation to La Vida of their statutory obligation to reimburse emergency providers that brought *noncontracting*

23

emergency service providers, such as plaintiffs, into a position of risk from La Vida's insolvency. Without such a delegation by the Health Plans, La Vida's financial instability and insolvency would have had no impact on plaintiffs. Therefore, if, as plaintiffs allege, the Health Plans knew or should have known at the time of entering into the delegation contracts with La Vida that La Vida would be unable to pay plaintiffs' claims, the fact that the Health Plans nevertheless transferred to La Vida the responsibility to process and reimburse plaintiffs' claims is closely connected to plaintiffs' losses. These circumstances distinguish these actions from *Quelimane*, *supra*, 19 Cal.4th 26, on which the Health Plans rely. (*Id.* at p. 58 [the relationship between a title insurance company's refusal to issue title insurance on tax-defaulted properties and purchasers' lost profit was "tenuous at best"].)

The fifth *Biakanja* factor is "the moral blame attach[ing] to . . . defendant[s'] conduct." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) It bears repeating that plaintiffs are noncontracting emergency service providers. As the Court of Appeal described the situation: "[Plaintiffs] are required by law to provide emergency services to all patients in need, regardless of ability to pay. Emergency physicians cannot pick and choose their patients, but must simply treat all emergency patients. The law then imposes a duty on the [health care service plans] — those entities which had contracted with the patients and agreed, for receipt of a premium, to provide them with basic medical care, including emergency services — to reimburse the emergency physicians for the emergency services provided to their enrollees. In other words, the [plans] had contracted with the patients to provide them, for a price, with health care services, including emergency services, with the understanding that those services may be provided by physicians whom the [plans] would be required to reimburse even though there was no contractual relationship between the [plans] and the emergency physicians

24

involved. [¶] There is no bar to a plan transferring a portion of its received premiums for an enrollee to an IPA in the form of capitation payments, and transferring responsibility for that enrollee's medical care to the IPA. But when the plan, as was alleged in this case, transfers its obligations to an IPA it knows, or [should] know, will be financially unable to fulfill its obligations, the result is that the emergency physicians will be forced (by statute) to continue providing emergency services to the IPA's enrollees, with no possibility of receiving their (statutorily mandated) reimbursement." We believe it is unfair and morally blameworthy for a health plan to take advantage of the statutory compulsion requiring noncontracting emergency service providers to continue providing their services in such a way. Because the emergency care providers rely exclusively on health care service plans to arrange payment for services received by their enrollees, plans that transfer those responsibilities onto an IPA they know or should know will not make those payments have not only shirked their statutory obligations, but have essentially withheld from emergency care providers the fair compensation to which they are entitled. Forcing others to provide professional services for the benefit of one's own customers, without any reasonable prospect of payment, is morally blameworthy.

We further conclude that imposing a duty on health care service plans to act reasonably, by choosing a financially solvent IPA or other RBO if they opt to delegate their reimbursement obligation, will protect noncontracting emergency service providers from future economic harm that such providers would otherwise not be able to avoid. Thus, the sixth *Biakanja* factor, which considers the policy of preventing future harm, also supports the imposition of such a duty.

In addition to arguing for an analysis of the *Biakanja* factors different from what we have expressed, defendants rely on *Bily*, *supra*, 3 Cal.4th 370, to argue that they owe no duty of care to plaintiffs. In *Bily*, we acknowledged the *Biakanja*

25

checklist of factors, but nevertheless declined to impose a duty running from the auditor of a public company to nonclient investors in the company. (*Bily*, *supra*, at pp. 397-398, 406.) We identified "three central concerns" with allowing "all merely foreseeable third party users of audit reports to sue the auditor on a theory of professional negligence." (*Id.* at p. 398.) First, we were concerned that the auditor could face vast numbers of suits and limitless financial liability far out of proportion to its fault and the connection between the auditor's conduct and the third party's injury. (*Id.* at pp. 399-402.) Second, we found that the class of plaintiffs was generally more sophisticated business lenders and investors, who could control and adjust their risks by contract rather than rely on tort liability. (*Id.* at pp. 402-403.) Third, we recognized that potential liability to third parties would more likely result in "an increase in the cost and decrease in the availability of audits and audit reports with no compensating improvement in overall audit quality." (*Id.* at pp. 404-405.) We are not persuaded that consideration of these factors requires the rejection of a duty of care on the part of a health care service plan making an initial delegation of financial risk.

First, we recognize that imposition of a duty on health care service plans to act reasonably in making an initial delegation of the responsibility to reimburse noncontracting emergency service providers for their compulsory services may, if violated, result in a number of suits by such providers for an undetermined amount in claims. But such providers are a limited and identifiable class of potential plaintiffs, whose services can be anticipated and likely statistically estimated. Moreover, even if such estimation is not always possible, it can hardly be said that imposition of a duty of care will likely result in a vast number of suits and limitless financial liability on the part of the plans that will be disproportionate to their fault. That is, unlike the secondary role played by the auditor in *Bily*, there is a " 'close connection' " to the economic injury suffered by noncontracting

26

emergency service providers if a plan brings them into a relationship with an insolvent IPA or other RBO through its unreasonable delegation of its statutory financial responsibilities. (*Bily*, *supra*, 3 Cal.4th at p. 401; see *Beacon Residential*, *supra*, 59 Cal.4th at pp. 581-583.) There is in effect a lineal connection between such alleged unreasonable conduct by a plan and the providers' injury.

Nor can the class of noncontracting emergency service providers, unlike the more sophisticated business lenders and investors class of plaintiffs in *Bily*, control and adjust their risks by contract rather than rely on tort liability. (*Bily*, *supra*, 3 Cal.4th at pp. 402-403; see *Beacon Residential*, *supra*, 59 Cal.4th at pp. 584-585.) The law requires emergency medical services or care to be provided at any licensed hospital that has appropriate facilities and qualified personnel regardless of a patient's ability to pay. (§ 1317, subds. (a), (b); 42 U.S.C. § 1395dd (b), (h).) Indeed, emergency service and care must be provided without even first questioning the patient as to insurance or ability to pay. (§ 1317, subd. (d); 42 U.S.C. § 1395dd (h); see *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 215.) And, if it turns out that the patient is enrolled in a health care service plan and the noncontracting emergency service providers are not paid by the plan's delegated IPA or other RBO because of the delegate's insolvency, it is questionable whether the providers can seek reimbursement from the patient. (See *Prospect Medical*, *supra*, 45 Cal.4th at pp. 502, 507 & fn. 5.) Thus, noncontracting emergency services providers must provide necessary services, but are generally at the mercy of a plan's delegation to an IPA or other RBO of the responsibility for their reimbursement.

Third, in *Bily*, we recognized that imposition of a duty of care to third parties, with its attendant potential for liability, would more likely result in "an increase in the cost and decrease in the availability of audits and audit reports with no compensating improvement in overall audit quality." (*Bily*, *supra*, 3 Cal.4th at

27

pp. 404-405.)  In contrast here, nothing suggests that health care service plans will be prevented or deterred from entering into delegation contracts if they are required to act reasonably in so doing.  Imposing a duty on plans to act reasonably in choosing an IPA or other RBO will promote a healthy functioning of the managed health care model endorsed by the Knox-Keene Act.  Indeed, a requirement that health care service plans reasonably select financially solvent delegates will more likely result in timely processing and ultimate payment of covered emergency service claims, which will in turn support the continuing availability and provision of such emergency services.

For the reasons given above, we conclude that health care service plans owe a duty of care to noncontracting emergency service providers in entering into their initial delegation contracts with IPAs or other RBOs and that the allegations of the *Centinela Freeman* and *Centinela Radiology* complaints are sufficient to state a cause of action for negligent initial delegation by the Health Plans.

### D.  A Cause of Action for Negligent Failure to Reassume the Delegated Responsibility

The Court of Appeal found that the factors that compel a finding of a common law duty of care on the part of a health care service plan in initially delegating its payment responsibility to an IPA under section 1371.4(e) also mandate a conclusion that the duty is a continuing one.  Thus, it concluded, a plan has a duty to promptly reassume its delegated obligation to pay noncontracting emergency service providers when it knows or should know that its delegated IPA has become financially unable to meet its delegated responsibility.

We agree that a health care service plan has a continuing duty of care to noncontracting emergency service providers, but we conclude the breadth of such duty is affected by the statutory goal of avoiding disruption of patients' medical care.  We hold that a health care service plan's duty to reassume the financial

28

responsibility it has delegated to a contracting medical provider group is triggered by the plan's receipt of information through which the plan becomes aware or should become aware that there can be no reasonable expectation that its delegate will be able to reimburse covered claims from noncontracting emergency service providers. That is, a health care service plan that initially responsibly delegates financial responsibility to an IPA or other RBO may reasonably expect that any financial difficulties subsequently experienced by its delegate can be adequately addressed through the CAP process and an approved final CAP. In such situation, a plan normally does not act negligently when it properly engages in and cooperates with the DMHC in such process. Doing so is required by section 1300.75.4.8 of the Solvency Regulations and affirmatively supports continuity of care by delegated medical provider groups to their patients, the plan's enrollees, one of the express goals of the Knox-Keene Act. (§ 1342, subd. (g).) Indeed, the Act, as implemented by the Solvency Regulations, specifically contemplates and favors rehabilitation of financially struggling RBOs in support of such purpose. (§ 1375.4(b)(4); Solvency Regs., § 1300.75.4.8.) However, a plan at all times retains a continuing duty to monitor and assess whether such an expectation is in fact reasonable under the particular circumstances presented and to timely take available, appropriate action to protect noncontracting emergency service providers when it knows or should know that there can be no reasonable expectation that its delegated IPA or other RBO will be able to reimburse their covered claims for emergency services.

We briefly discuss how the *Biakanja* factors support imposing this continuing common law duty of care.

As noted earlier, the first *Biakanja* factor considers whether "the transaction was intended to affect the plaintiff." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) We agree with the Court of Appeal that after the initial delegation, health care service

29

plans necessarily intend to affect the potential plaintiff class of noncontracting emergency service providers by continuing or renewing their delegation to an IPA or other RBO of their responsibility to pay emergency service providers under section 1371.4(e).

The second *Biakanja* factor focuses on the foreseeability of harm to noncontracting emergency services providers. Plaintiffs allege that the Health Plans knew or should have known that the three La Vida IPAs failed to comply with multiple state financial solvency requirements beginning in 2007, and continuing through each quarter for the following four years, resulting in their failure to reimburse the plaintiff noncontracting service providers for the emergency care that they provided to enrollees of defendant Health Plans during that time. They allege that the Health Plans were advised in October 2009 that La Vida's lender sought protection under the bankruptcy laws and withdrew $4 million dollars from La Vida's account, and that La Vida was unable to obtain funding from capital markets. The complaints allege that under the circumstances the Health Plans lacked any reasonable expectation that La Vida would reimburse plaintiffs, but nevertheless the plans waited until May and June 2010, years after La Vida began openly demonstrating financial instability, to finally discontinue their capitation payments to La Vida and terminate their delegation contracts. Assuming the truth of these allegations for purposes of demurrer, plaintiffs' financial harm was foreseeable.

And again, there is no dispute that plaintiffs have suffered actual injury, meeting the third *Biakanja* factor. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.)

The fourth factor is "the closeness of the connection between defendants' conduct and the injury suffered." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) In considering this factor, we note that, as we have earlier explained, the Legislature has provided, through the Knox-Keene Act, comprehensive regulation of the

30

managed health care system under the jurisdiction of the DMHC. (*Prospect Medical*, *supra*, 45 Cal.4th at p. 504.) It has approved various risk-shifting arrangements by plans (§ 1348.6, subd. (b)), specifically allowing plans to delegate their responsibility to pay for emergency services and care. (§ 1371.4(e).) It has recognized and addressed the evolving problem of insolvency of delegated IPAs and other RBOs through the establishment of the DMHC's Financial Solvency Standards Board (§ 1347.15) and a regulatory framework that is intended to ensure the fiscal performance of IPAs and other RBOs by early identification of performance deficiencies and implementation of CAPs. (§§ 1375.4, 1375.5 ,1374.6; see *Department of Managed Health Care*, vol. 17, No. 2, Cal. Reg. L.Rptr., *supra*, at pp. 29-30.) As described earlier, the CAP collaborative system is specifically aimed at correcting identified deficiencies of a financially unstable delegated IPA or other RBO. (Solvency Regs., § 1300.75.4.8, subd. (a)(4) & (5).) Such instability may be caused by a myriad of economic and business circumstances, which may be outside the control of the delegated IPA or other RBO. The instability may be unrelated to the health care service plans' actions.

When, however, in light of those particular circumstances, a health care service plan can have no reasonable expectation that its delegated IPA or other RBO will be able to pay the claims of noncontracting emergency service providers through a CAP process, we believe the eventual failure of its delegate to pay such claims can be considered closely connected to the plan's conduct. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) A plan that knows or should know that the financial problems of its delegated IPA or other RBO are of such a magnitude that the initiation or continuation of a CAP process will not result in payment of the noncontracting emergency service providers' covered claims, but nevertheless takes no available action to protect such providers, directly places those providers

31

in a position of additional financial risk because of their statutory obligation to provide emergency services to the plan's enrollees.

Here, plaintiffs' complaints allege that the Health Plans knew or should have known of La Vida's financial deficiencies, which spanned the course of four years. Plaintiffs allege that the Health Plans were specifically advised that La Vida's lender had filed a petition for relief under the bankruptcy laws in October 2009 and had withdrawn millions of dollars from La Vida's account, and that La Vida had no alternate financing. Plaintiffs allege that the Health Plans continued their La Vida delegation contracts without any reasonable expectation, under these circumstances, that La Vida would reimburse plaintiffs' emergency service claims. Such allegations sufficiently allege a close connection between Health Plans conduct and plaintiffs' financial injury.

To the extent that health care service plans engage in the CAP process in good faith and with a reasonable expectation that a final CAP will result in payment of providers' claims, no moral blame can be assigned to their failure to act outside of that process to reassume the obligation to pay the claims of noncontracting emergency service providers. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Both the statutes and the regulations strongly favor rehabilitation of financially troubled IPAs or other RBOs through the CAP process and such rehabilitation depends on the cooperation of health care service plans, who should not fear that cooperation with the regulatory process exposes them to tort liability. But, in the limited situation where a health care service plan knows or should know that there can be no reasonable expectation of a successful CAP resulting in reimbursement of the claims of noncontracting emergency service providers, the failure of health care service plans to take available action to protect such providers is morally blameworthy.

32

Finally, imposing a continuing duty of care, as we have defined it, on health care service plans will help prevent future economic harm to noncontracting emergency service providers. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.)

We expressly decline, however, to impose a continuing duty of care broader than the one we have described because of the balance of policy interests at play here. (*Bily*, *supra*, 3 Cal.4th at pp. 404-405.) A health care service plan should not be required to reassume its delegated financial responsibility to pay noncontracting emergency service providers, for example, at the first sign that its delegate is experiencing financial difficulty or when it receives notice that there has been a failure to pay noncontracting emergency service providers' covered claims or based on the initiation of CAP proceedings alone. Imposition of such a broad common law tort duty would risk interfering with the statutory and regulatory CAP process for the rehabilitation of troubled RBOs because it would incentivize a health care service plan to terminate its delegation contracts and reassign its patient enrollees and thus interrupt medical care in lieu of the CAP process. Such action would undermine the carefully balanced and comprehensive managed health care scheme established by the Knox-Keene Act (§ 1342), which expressly approves delegation contracts (§ 1371.4(e)) and supports a regulatory framework for the restoration of fiscal stability to financially deficient RBOs (Solvency Regs., § 1300.75.4.8, subd. (a)(4) & (5)), in part to ensure continuity of patient care. (§ 1342, subd. (g).)

## IV. CONCLUSION

We conclude that health care service plans owe a common law tort duty to noncontracting emergency service providers to act reasonably in initially delegating their financial responsibility to an IPA or other RBO under section 1371.4(e). The Court of Appeal correctly determined, therefore, that a cause of action exists in favor of noncontracting emergency service providers that allege, as

33

here, that a health care service plan negligently delegated its duty to pay emergency service claims to an IPA that it knew or should have known was financially unsound. We also conclude that a health care service plan has a narrow continuing common law tort duty to noncontracting emergency providers to monitor and assess the financial condition of its delegate and to timely take available, appropriate action to protect noncontracting emergency service providers when it knows or should know that there can be no reasonable expectation that its delegated IPA or other RBO will be able to reimburse their covered claims for emergency services. The Court of Appeal correctly determined, therefore, that a cause of action exists in favor of noncontracting emergency service providers, as pleaded or could be pleaded here, for a violation of such continuing duty. The trial court erred in sustaining the Health Plans' demurrers without leave to amend.

## V. DISPOSITION

The judgment of the Court of Appeal, which reversed the trial court's order sustaining defendants' demurrers to the complaints, is affirmed. The matter is remanded to the Court of Appeal with directions that it remand these consolidated actions to the trial court for further proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**Name of Opinion** Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 225 Cal.App.4th 237
**Rehearing Granted**
_____

**Opinion No.** S218497
**Date Filed:** November 14, 2016
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John Shepard Wiley, Jr.
_____

**Counsel:**

Michelman & Robinson, Andrew H. Selesnick, Damaris L. Medina, Robin James and Jason O. Cheuk for Plaintiffs and Appellants.

Francisco J. Silva, Long X. Do and Michelle Rubalcava for California Medical Association, California Hospital Association, California Orthopaedic Association, California Radiological Society and California Society of Pathologists as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Office of Astrid G. Meghrigian and Astrid G. Meghrigian for California Chapter of the American College of Emergency Physicians as Amicus Curiae on behalf of Plaintiffs and Appellants.

Reed Smith, Kurt C. Peterson, Kenneth N. Smersfelt, Zareh A. Jaltorossian; Grignon Law Firm and Margaret M. Grignon for Defendant and Respondent Blue Cross of California doing business as Anthem Blue Cross.

Crowell & Moring, William A. Helvestine, Ethan P. Schulman and Damian D. Capozzola for Defendant and Respondent Health Net of California, Inc.

Crowell & Moring and Jennifer S. Romano for Defendant and Respondent Pacificare of California doing Business as Secure Horizons Health Plan of America.

Manatt, Phelps & Phillips, Gregory N. Pimstone , Joanna S. McCallum and Jeffrey J. Maurer for Defendant and Respondent California Physicians' Service doing business as Blue Shield of California.

Hernandez Schaedel & Associates, Gonzalez Saggio & Harlen, Zuber Lawler & Del Duca, Don A. Hernandez and Jamie L. Lopez for Defendant and Respondent SCAN Health Plan.

Gibson, Dunn & Crutcher, Krik A. Patrick, Richard J. Doren and Heather L. Richardson for Defendant and Respondent Aetna Health of California.

DLA Piper, Cooley, William P. Donovan, Jr., and Matthew D. Caplan for Defendant and Respondent Cigna HealthCare of California, Inc.

**Page 2 – S281497 – counsel continued**

**Counsel:**

Barger & Wolen, John M. LeBlanc; Hinshaw & Culbertson, Sandra I. Weishart and Larry M. Golub for California Association of Health Plans and CAPG as Amicus Curiae on behalf of Defendants and Respondents.

Carol L. Ventura, Drew Brereton and Sheila M. Tatayon for California Department of Managed Health Care as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew H. Selesnick
Michelman & Robinson
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90024
(310) 564-2670

Margaret M. Grignon
Grignon Law Firm
5150 E. Pacific Coast Highway, Suite 200
Long Beach, CA  90804
(562) 285-3171