Filed 11/24/21 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LONG BEACH MEMORIAL MEDICAL CENTER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., et al., <br><br> Defendants and Appellants. | B304183, consolidated with B306322 <br><br> (Los Angeles County Super. Ct. No. NC061310) <br><br> ORDER MODIFYING OPINION <br><br> NO CHANGE IN JUDGMENT |

COURT:

It is ordered that the opinion filed herein on November 4, 2021, be

    modified as follows:

    1. On page 21, the sentence beginning on the seventh line of the page is modified to read as follows:

The quantum meruit remedy by definition looks to the reasonable, market-based value of the services provided:  That value is calculated by looking at the "full range of fees" charged and accepted in the market (e.g., *Sanjiv Goel, M.D., Inc. v. Regal Medical Group, Inc.* (2017) 11 Cal.App.5th 1054, 1060, 1062 (*Goel*)), and thus encompasses the lower rates grounded in contracts as well as the higher rates charged and accepted where no contract exists.

There is no change in the judgment.

_____

ASHMANN-GERST, Acting P. J., CHAVEZ, J., HOFFSTADT, J.

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LONG BEACH MEMORIAL MEDICAL CENTER et al., | B304183, consolidated with B306322 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. NC061310) |
| v. | |
| KAISER FOUNDATION HEALTH PLAN, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and a postjudgment order of the Los Angeles Superior Court, Michael P. Vicencia, Judge. Judgment affirmed; postjudgment order reversed and remanded for further proceedings.

---

\*      This opinion is published as to all but Sections IV and V of the Discussion.

Jones Day, Erica L. Reilley, David J. Feder, Kevin L. Kenney; Payne & Fears, C. Darryl Cordero, Robert C. Leventhal, Damon Rubin, and Randy R. Haj for Plaintiffs and Appellants.

King & Spalding, Marcia Augsburger, Daron Tooch, Anne Voigts, and Amanda Hayes-Kibreab for California Hospital Association, Sharp Healthcare, Natividad Medical Center, Pomona Valley Hospital Medical Center, and Kaweah Delta Health Care District as Amici Curiae on behalf of Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum, John T. Fogarty, Marina Shvarts; Kellog, Hansen, Todd, Figel & Frederick, David C. Frederick, Daniel G. Bird, Joseph L. Wenner, and Jayme L. Weber for Defendants and Appellants.

\* \* \* \* \* \*

Under federal and state law, a hospital is required to provide "necessary stabilizing treatment" for any person in an "emergency medical condition." (42 U.S.C. § 1395dd, subd. (b); Health & Saf. Code, § 1317, subd. (a).)[1] If that person is covered by a health care service plan, California's Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act) (§ 1340 et seq.) requires the plan to reimburse the hospital for providing such "emergency services and care." (§ 1371.4, subd. (b).) The amount of reimbursement depends upon whether the hospital and plan already have a contract in place: If they do, the plan must pay the "agreed upon" contractual rate (Cal. Code Regs., tit.

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

2

28, § 1300.71, subd. (a)(3)(A)); if they do not, the plan must pay the "reasonable and customary value for the [emergency] health care services rendered" (*id.*, subd. (a)(3)(B)).  If a plan without a contract pays reimbursement that the hospital believes is below the "reasonable and customary value," the hospital may sue the plan in quantum meruit for the shortfall.  (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 505 (*Prospect Medical*).)

This appeal raises three issues of first impression regarding the scope of a hospital's lawsuit to collect reimbursement from a plan with which it has no contract, as well as the law applicable in that lawsuit.  First, in addition to quantum meruit, may a hospital sue for the tort of intentionally paying an amount that is less than what a jury might later determine is the "reasonable and customary value" of the emergency medical services, and thereby obtain punitive damages?  Second, in addition to quantum meruit, may the hospital sue for injunctive relief under California's unfair competition law (Bus. & Prof. Code, § 17200) to enjoin the plan from paying too little reimbursement for possible future claims not covered by a contract?  Lastly, in the quantum meruit claim itself, does a trial court err in instructing the jury that the "reasonable value" of emergency medical services is defined as "the price that a hypothetical willing buyer would pay a hypothetical willing seller for the services, [when] neither [is] under compulsion to buy or sell, and both hav[e] full knowledge of all pertinent facts"?

For the reasons described more fully below, we hold that the answer to all three question is "no."  Because we also reject challenges to several of the trial court's evidentiary rulings in the

unpublished portion of this opinion, we affirm the jury's verdict in this case finding that the plan had paid the suing hospital the reasonable and customary value of its emergency medical services. However, also in the unpublished portion, we reverse the trial court's order categorically denying the plan its costs and remand the matter for the trial court to examine the specific challenges the hospital has raised to the plan's cost bill.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The parties*

##### 1. *The hospitals*

The Long Beach Memorial Medical Center and the Orange Coast Memorial Medical Center (individually, Long Beach Memorial and Orange Coast Memorial; collectively, the hospitals) operate three hospitals in the region encompassing the southern portion of Los Angeles County as well as the northern portion of Orange County.

The hospitals price their medical services using two rates—namely, (1) the full-price rate they *bill*, which operates like the "sticker price," and (2) the discounted rate they agree to accept. The hospitals collect their full, billed rate only one to 10 percent of the time. Usually, the hospitals agree to accept a lesser amount, which is typically expressed as a percentage of the full, billed rate. That amount varies, depending on whether the payor is a government program (such as Medicare or Medi-Cal), a health plan or health insurance company that has negotiated a contract with the hospitals (a so-called "managed care agreement"), a member of a so-called "rental network" which negotiates rates with hospitals on behalf of network members, or an individual paying cash.

4

For instance, between 2015 and 2017, the hospitals agreed to accept the following rates from the following groups:

| Payor | Percentage of full, billed rates |
|---|---|
| Medi-Cal | 10% |
| Medicare | 15% |
| Health plans with contractual "managed care agreements" | Typically, between 40% and 65%, with between 44% and 52% paid for trauma and emergency services |
| Member of a "rental network" | Typically, between 60% and 85% |
| Individuals paying cash | 22% |

Between 2015 and 2017, the average rate which the hospitals agreed to accept for emergency medical services—across all of these categories—was 27 percent of the hospitals' full, billed rates.

### 2. *The Kaiser entities*

Kaiser Foundation Health Plan, Inc. (Kaiser) is an "insurance company" that provides medical insurance to its enrollees. Kaiser Foundation Hospitals is a related entity, and operates hospitals throughout California, although none in the communities served by the hospitals.

### B. *Prior contracts between the hospitals and Kaiser*

In the past, Kaiser had entered into managed care agreements with the hospitals; Kaiser let its agreement with Orange Coast Memorial expire in 2008 and let its agreement with Long Beach Memorial expire in June 2015. Under the most

5

recent iteration of these agreements,[2] the hospitals agreed to accept from Kaiser the following rates for the following medical services:

| Service | Percentage of full, billed rates |
|---|---|
| General medical services | 47% |
| Emergency room services | 56% |
| Outpatient trauma services | 73.4% |
| Inpatient trauma services | 76% |

### C.   *Postcontractual payments*

Although Kaiser allowed its managed care agreements with the hospitals to expire, Kaiser's enrollees would still sometimes seek emergency medical care from the hospitals, and under the Knox-Keene Act, the hospitals were obligated to provide emergency medical care to those enrollees.

Between July 2015 and October 2015, Kaiser joined several different rental networks and, pursuant to those networks' agreements with the hospitals, ended up paying the hospitals between 75 and 85 percent of the hospitals' full, billed rates for the emergency medical services provided to their enrollees.

In October 2015, Kaiser used an internal methodology for calculating the reasonable value of medical services.  Between October 2015 and October 2017, the hospitals provided prestabilization emergency medical services to 3,609 Kaiser enrollees, and billed Kaiser for those services at their full-billed rate for a total of $31,007,982.  Using its internal methodology,

---

[2]     The parties only introduced the rates from the Long Beach Memorial agreement, and did not distinguish the rates in the Orange Coast Memorial agreement.  We will do the same.

6

Kaiser reimbursed the hospitals $16,524,537—or 53.2 percent of the full, billed charges.

## II.    Procedural Background

### A.    *Pleadings*

#### 1.    *The hospitals' complaint(s)*

In August 2017, the hospitals sued Kaiser, Kaiser Foundation Hospitals, Kaiser Permanente Insurance Company, and The Permanente Medical Group, Inc.

In the operative, second amended complaint filed in May 2018, the hospitals sued Kaiser, Kaiser Foundation Hospitals, and Kaiser Permanente Insurance Company[3] for (1) breach of contract (namely, breaching the rental network contracts), (2) breach of an implied contract and recovery of services rendered—that is, quantum meruit—under the Knox-Keene Act, (3) the tort of intentionally violating the "statutory duty under the Knox-Keene Act to provide and pay for the reasonable and customary value of" emergency medical services by "implement[ing] a provider reimbursement structure that systematically fails to pay [and] underpays" the hospitals,[4] and (4) violating the unfair competition law by "systematically failing to pay [and] underpaying" the reimbursement required by the Knox-Keene Act.  The hospitals sought reimbursement for underpayments made between October 2015 and October 2017 allegedly totaling $26,750,000, punitive damages for the intentional tort, and an

[3]     The hospitals dropped Permanente Medical Group, Inc. as a defendant.

[4]     The hospitals also allege that Kaiser "strategically" placed its medical facilities in geographic locations that would obligate the hospitals to serve their patients, but they have abandoned this allegation on appeal.

injunction "enjoining Kaiser" from violating the Knox-Keene Act by underpaying charges in the future.

### 2. *Kaiser's cross-complaint*

Kaiser filed a cross-complaint to recapture any payments it may have made to the hospitals in excess of the reasonable value of the emergency medical services provided.

### B. *Summary adjudication of intentional tort and unfair competition claims*

Kaiser moved for summary adjudication of the hospitals' intentional tort and unfair competition claims. Following briefing and a hearing, the trial court granted the motion and dismissed those two claims. The court ruled that recognizing an intentional tort for underpayment of reimbursement costs would "undermine the carefully balanced and comprehensive managed health care scheme established by the Knox-Keene Act" and would be "full of pitfalls that [the court] can't begin to comprehend." The court ruled that recognizing an unfair competition claim for underpayment made no sense because enjoining Kaiser from "paying inadequate reimbursement" was not a workable injunction.

As the summary adjudication motion was being litigated, the hospitals voluntarily dismissed Kaiser Permanente Insurance Co. as a defendant.

### C. *Trial*

After two days of pretrial hearings, the trial court convened a three-day jury trial.

The trial was a proverbial battle of the experts. The hospitals' expert testified that the reasonable value of the hospitals' emergency services was 85 percent of the hospitals' full, billed rate, which came to $27,137,053.25. Subtracting

Kaiser's previous reimbursements, the hospitals' expert opined that Kaiser *underpaid* by $9,815,080.25. Kaiser's expert testified to the charges the hospitals accepted from a variety of different payors, and opined that Kaiser had *overpaid* the hospitals by as little as $222,285 and by as much as $11,755,594.

Midtrial, the court granted a nonsuit as to Kaiser Foundation Hospitals.

The jury returned a special verdict finding that Kaiser—the sole remaining defendant—had paid the hospitals "an amount equal to or greater than [the] reasonable value" of the hospitals' services, and that the reasonable value of those services was $16,524,537. Because that amount was precisely the amount Kaiser had already paid as reimbursement, Kaiser voluntarily dismissed its cross-claim.

### D. *Costs*

Kaiser filed a memorandum of costs seeking $229,903.96 in costs as the prevailing party.

The hospitals filed a motion to tax costs, arguing that (1) Kaiser was not the prevailing party, and (2) many of the line items were not recoverable or reasonable. Following further briefing, the trial court granted the hospitals' motion to tax "in its entirety" and awarded no costs.

### E. *Appeal and cross-appeal*

Following the entry of judgment, the hospitals filed a timely notice of appeal. Following the postjudgment order denying all costs, Kaiser filed a timely notice of cross-appeal.[5]

---

[5] Kaiser Foundation Hospitals also sought its costs and cross-appealed the trial court's denial of those costs. For convenience, we refer to both parties as "Kaiser" solely when discussing the costs proceedings and cross-appeal.

9

## DISCUSSION

## I. Pertinent Background of Regulatory Scheme

Under the federal Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395dd et seq.) and the Knox-Keene Act, hospitals and other medical providers have a statutory duty to provide "emergency [medical] services and care" to persons who are in "danger of loss of life, or serious injury or illness." (Health & Saf. Code, § 1317, subd. (a); 42 U.S.C. § 1395dd, subd. (b); *Prospect Medical*, *supra*, 45 Cal.4th at p. 501; *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 189 (*T.H.*).) Under the Knox-Keene Act, the health care service plan (or its "contracting medical providers") must, within 30 or 45 days, reimburse the hospital or other medical providers for the "emergency services and care provided to its enrollees" as to (1) all care necessary for "stabilization" of the enrollee, and (2) for all poststabilization care the plan authorizes the hospital to provide. (Health & Saf. Code, § 1371.4, subds. (b) & (c); Cal. Code Regs., tit. 28, § 1300.71, subd. (g); *T.H.*, at p. 189.) When the hospital or other medical providers have a contract with the plan, the plan must reimburse them for the services at the "agreed upon contract rate." (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(A).)

However, when the hospital or other medical providers do *not* have a contract with the plan, the plan is statutorily obligated to reimburse the hospital or providers for the "reasonable and customary value [of] the [emergency] health care services rendered." (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B).) "The reasonable and customary value" must "take[] into consideration" six different factors—namely, (1) "the [hospital's or] provider's training, qualifications, and length of

10

time in practice"; (2) "the nature of the services provided"; (3) "the fees usually charged by the [hospital or] provider"; (4) "prevailing [hospital or] provider rates charged in the general geographic area in which the services were rendered"; (5) "other aspects of the economics of the [hospital's or] medical provider's practice that are relevant"; and (6) "any unusual circumstances in the case."[6] (*Ibid.*)

If a hospital or other medical provider believes that the amount of reimbursement it has received from a health plan is below the "reasonable and customary value" of the emergency services it has provided, the hospital or provider may assert a quantum meruit claim against the plan to recover the shortfall. (*Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 213-214, 221 (*Bell*); *Prospect Medical, supra*, 45 Cal.4th at p. 505; *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1273 (*Children's Hospital*).) As the plaintiff in a quantum meruit lawsuit, the hospital or provider bears the burden of establishing that the plan's reimbursement was less than the "reasonable and customary value" of its services. (*Children's Hospital*, at p. 1274.)

## II. Propriety of Pretrial Dismissal of the Hospitals' Intentional Tort and Unfair Competition Claims

The hospitals argue that that the trial court erred in granting summary adjudication of their claims against Kaiser for (1) intentionally reimbursing them at an amount below the "reasonable and customary value" of the emergency medical

---

[6] These factors are borrowed from *Gould v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059, 1071, which used them to define how to calculate "reasonable" medical care charges in the workers' compensation context.

11

services they provided, and (2) violation of the unfair competition law.

Like summary judgment, summary adjudication is appropriate when the moving party shows "[it] is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)) because, among other things, the nonmoving party (here, the hospitals) cannot establish "[o]ne or more elements of [its] cause of action" (*id.*, subd. (o)(1)); see *id.*, subd. (p)(2)). Because a motion for summary adjudication "necessarily includes a test of the sufficiency of the complaint" (*Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1595), summary adjudication is also appropriate if the entire cause of action is unsupported by the law. Because the propriety of summary adjudication and the subsidiary question of the validity of a cause of action involve questions of law, our review is de novo. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273; *Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1111.)

**A.** ***Tort of intentional failure to reimburse the "reasonable and customary value" of emergency medical services***

Because "'[a] tort, whether intentional or negligent, involves a violation of a *legal duty* . . . owed by the defendant to the person injured,'" and because the existence of a legal duty turns on whether the ""sum total"" of ""policy"" ""considerations"" favors ""say[ing] that the particular plaintiff is entitled to [the] protection"" of tort law, our task in deciding whether to recognize a tort for intentionally failing to reimburse a hospital or medical provider for the "reasonable and customary value" of emergency medical services is to "examine and weigh the relevant 'considerations of policy'" and to ask whether the

12

"social benefits" of creating such a tort remedy "outweigh[] any costs and burdens it would impose." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8 (*Cedars*), italics in original; *Gregory v. Cott* (2014) 59 Cal.4th 996, 1012 ["'A tort, whether intentional or negligent, involves a violation of a *legal duty . . .*'"];) *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1013 (*Centinela*) [looking to whether "'public policy . . . dictate[s] the existence of a duty . . .'"]; *The MEGA Life & Health Ins. Co v. Superior Court* (2009) 172 Cal.App.4th 1522, 1527 ["whether to recognize a new 'legal wrong' or 'tort' is often governed by policy factors"].)[7] Although our Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*) and *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*) identified several factors bearing on the propriety of recognizing a new tort,[8] we need not

---

[7] Although there is language in *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 967 (*Fuller*) that "'*everyone* owes a duty not to commit an intentional tort against *anyone*,'" the *Fuller* court's use of italics confirms that this statement is meant, at most, to show that there need not be a preexisting relationship between the intentional tortfeasor and the victim. Because *Fuller* itself involved the underlying legal duty not to defraud others (*id.* at pp. 958-959), *Fuller* does not stand for the broader proposition that courts may entirely skip the precursor question of whether there is an underlying legal duty when it comes to intentional torts. And to the extent *Fuller* is read to stand for that proposition, we respectfully disagree.

[8] *Biakanja* lists the factors relevant in the "business context" as (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to [the plaintiff]," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the

13

examine them on a factor-by-factor basis where, as here, the social benefits and costs of a potential new tort are more aptly analyzed in the aggregate. (*Kurtz-Ahlers, LLC v. Bank of America, N.A.* (2020) 48 Cal.App.5th 952, 961.)

The relevant policy considerations counsel against recognizing a legal duty by health plans—compensable via a tort—not to reimburse hospitals and other medical providers of emergency medical services at an amount less than the "reasonable and customary value" of those services.

The social benefits of recognizing such a duty are slight. The hospitals have provided no evidence or argument suggesting that inadequate reimbursement for emergency medical services under the Knox-Keene Act is a widespread problem (see *Cedars*, *supra*, 18 Cal.4th at p. 13 [looking whether "problem" to be solved by tort liability is "widespread"]), or that the problem is not

---

closeness of the connection between defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm." (*Biakanja*, at p. 650.) *Rowland* lists the factors relevant outside the business context: "The first five *Rowland* [factors] are identical to the second through sixth *Biakanja* [factors]. (See *Rowland*, at pp. 112-113.) Where the list of [factors] differs is that (1) *Rowland* does not consider 'the extent to which the transaction was intended to benefit the plaintiff' (*Biakanja*, . . . at p. 650) (because there is no transaction), and (2) *Rowland* adds two further [factors] that flesh out 'the policy of preventing future harm' consideration—namely, (a) 'the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach,' and (b) 'the availability, cost, and prevalence of insurance for the risk involved.' (*Rowland*, at p. 113.)" (*QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 999.)

sufficiently addressed by the quantum meruit remedy already available to hospitals and other medical providers (see *Brennan v. Tremco* (2001) 25 Cal.4th 310, 314 [looking at whether new tort remedy is "derivative" because "adequate remedies" already exist]).  Amici curiae for the hospitals assert that underreimbursement is a problem, but provide nothing to substantiate that assertion, and the jury's finding of proper reimbursement in this case, which we conclude below was valid, would seem to undermine that assertion.

The social costs of recognizing a new tort duty, on the other hand, are staggering.  The trial court lamented that such a new tort would be "full of pitfalls" too numerous to enumerate.  We agree, but will enumerate a few.

First, recognizing a legal duty—and, on the basis of that duty, an intentional tort—not to underreimburse a hospital the "reasonable and customary value" of emergency medical services runs afoul of the longstanding principle that tort "liability . . . for purely economic losses is 'the exception, not the rule.'"  (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 400; *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 715; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58; *Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 81-82 (*Harris*) ["our Supreme Court has advised against judicial activism where an extension of tort remedies is sought for a duty whose breach previously has been compensable by contract remedies"].)  This principle rests on the premise that economic relationships are typically governed by contracts or by comprehensive government regulation, and recognizes that tort liability creates incentives that alter the conduct of market participants and thus runs the risk of

15

significantly reordering these relationships and the economic markets in which they are formed. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 694 (*Foley*) ["Significant policy judgments affecting social policies and commercial relationships are implicated [by creating a new tort and] . . . ha[ve] the potential to alter profoundly the nature of [those relationships]"].) What is more, this principle is fully implicated here because the economic relationship regarding the payment for emergency medical services between hospitals and other medical providers (on the one hand) and health plans (on the other) is governed both by contracts *and* by comprehensive government regulation: The underlying duty to repay is established by the Knox-Keene Act, which is a "'comprehensive system of licensing and regulation under the jurisdiction of the Department of Managed Health Care'" (*Prospect Medical*, *supra*, 45 Cal.4th at p. 504; *Centinela*, *supra*, 1 Cal.5th at p. 1005), while the amount of repayment is governed either by contract (when the parties have a preexisting contract) or by the quasi-contractual remedy of quantum meruit (when they do not) (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346 [quantum meruit is a type of "'contract implied in law'" or "'[q]uasi-contract'"]; *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 [same]; *Newfield v. Insurance Co. of the West* (1984) 156 Cal.App.3d 440, 445 [cause of action for breach of an implied contract does not "sound in tort"]).

Second, recognizing a legal duty—and, on the basis of that duty, an intentional tort—not to underreimburse a hospital the "reasonable and customary value" of emergency medical services would inevitably lead to an outcome fundamentally at odds with one of the avowed purposes of the Knox-Keene Act to "help[]

16

ensure the best possible health care for the public *at the lowest possible cost* by transferring the financial risk of health care from patients to providers." (§ 1342, subd. (d), italics added; *Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 207.) If we recognize a legal duty not to underreimburse hospitals and other medical providers for the "reasonable and customary value" of emergency medical services, that duty would ostensibly give rise to a negligence-based tort claim as well as the intentional tort claim the hospitals explicitly urge us to create here. A health plan would be liable for negligence if it acted unreasonably in anticipating the "reasonable and customary value" of the services its enrollees received. But such a negligence-based tort would be both useless and impossible to comply with. It is useless because the alleged damages—the amount by which it shorted the hospital or medical provider—are already recoverable in a quantum meruit action. It is impossible to comply with because a health plan's liability would turn on whether the reimbursement amount it pays on day 45 ends up being *reasonably* or *unreasonably* below the amount that a jury in the quantum meruit action will fix on day 200 as being the "reasonable and customary value" of the services rendered. Health plans trying to avoid negligence liability for this tort would have every incentive to pay more just to be safe, which would drive up the cost of health care to the public—a result, as noted above, that is at odds with one of the Knox-Keene Act's purposes. A health plan would be liable for the intentional tort if it *intended* to pay less than the amount that a jury at some point in the future fixes as being the "reasonable and customary value" of the services rendered. But health plans do not *accidentally* select the amount of reimbursement they remit to a

17

hospital or other medical provider; the payment amount is always intentionally selected. As a result, the only way to avoid liability for such an intentional tort is to err on the side of paying too much—which will also drive up the cost of health care, and thus is also at odds with one of the Knox-Keene Act's purposes.

Third, recognizing a legal duty—and, on the basis of that duty, an intentional tort—not to underreimburse a hospital the "reasonable and customary value" of emergency medical services would create a powerful incentive for a hospital or other medical provider to bring such a tort claim in every case. By statute, punitive damages are available whenever a tortfeasor is "guilty of oppression, fraud, or malice" (Civ. Code, § 3294, subd. (a)), and this finding turns on the tortfeasor's alleged motive (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516). The hospitals in this case assert that Kaiser is deserving of punitive damages because it intentionally underpaid them with the alleged bad motive of trying to save money and turn a profit. Given that health plans' payments are always intentional and that health plans always act to varying extents with a profit motive, health plans would be potentially liable for punitive damages in every case. And given that punitive damages can be imposed up to a constitutional maximum of 10 times the amount of the underpayment (see *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182 (*Simon*) ["ratios between the punitive damages award and the plaintiff's actual or compensatory damages significantly greater than 9 or 10 to 1 are suspect"]), hospitals and other medical providers would have every reason to bring an intentional tort claim in every case in the hopes of convincing a jury to award them up to 11 times the amount of underpayment. Where, as here, the

18

"imposition of a tort duty of care" is "likely to add an unnecessary and potentially burdensome . . . volume of . . . litigation," that potentiality counsels strongly against such a duty. (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 841; *Centinela, supra*, 1 Cal.5th at pp. 1017-1018 [same]; *Cedars, supra*, 18 Cal.4th at p. 15 [discouraging creation of a duty when "[a] separate tort remedy would be subject to abuse"]; see *Harris, supra*, 14 Cal.App.4th at p. 81 [discouraging "[p]roposals to extend tort remedies to commercial contracts[, which] create the potential of turning every breach of contract dispute into a punitive damage claim"].)  And even if it is desirable to try to draw a line between an ordinary, "healthy" profit motive that does not warrant punitive damages and a truly venal profit motive that does, that line is far too illusory to offset the otherwise powerful incentive to take one's chances by suing for punitive damages.  (Accord, *Foley, supra*, 47 Cal.3d at p. 697 [refusing to create a tort when "it would be difficult if not impossible to formulate a rule that would assure that only 'deserving' cases give rise to tort relief"].)

The hospitals and their amici respond with what boil down to two arguments.

First, the hospitals argue that Kaiser is already under a tort duty not to violate the Knox-Keene Act's provisions because *Centinela, supra*, 1 Cal.5th 994, previously recognized a *negligence-based* tort grounded in the Knox-Keene Act, and because a *negligent* violation of this duty must necessarily be subsumed within an *intentional* violation of the same duty.  This argument rests on an incorrect and overgeneralized reading of *Centinela.  Centinela* held that a health plan has a legal duty, enforceable in a tort claim, (1) not to negligently "delegate its

19

financial responsibility" to reimburse hospitals and other medical providers under the Knox-Keene Act to other entities known as risk-bearing organizations if the plan knows or should know that its delegate "would not be able to pay" the reimbursements, and (2) not to negligently "continu[e] or renew[] a delegation contract" with its delegate "when it knows or should know that there can be no reasonable expectation that its delegate will be able to" pay reimbursements. (*Centinela,* at pp. 1002, 1017-1022; *T.H., supra,* 4 Cal.5th at p. 189.) Because a health plan's act of delegation absolves the plan of any further liability under the Knox-Keene Act (*Centinela,* at pp. 1010, 1014), the legal duty recognized in *Centinela* operated to fill a gap in the provisions of the Knox-Keene Act that would have otherwise allowed health plans to make reckless—and hence "morally blameworthy"—delegations of the duty to pay and thereby to leave hospitals and other medical providers "without any reasonable prospect of payment" despite their statutory entitlement to such remuneration. (*Id.* at p. 1017.) Contrary to what the hospitals suggest, *Centinela* did not purport to create a free-floating tort duty attaching to every provision of the Knox-Keene Act, including those where there is no gap, such as in the context of this case, where the hospitals and other medical providers already have the right to sue for quantum meruit to recover any underpayment. Second, amici seem to suggest that a tort remedy is warranted because the existing quantum meruit remedy is inadequate. Specifically, they urge that the quantum meruit remedy inevitably undervalues emergency medical services because "reasonable and customary value" is keyed to the *market* value for those services and the market includes *contractually* agreed-upon rates, yet those contract-based rates are lower because hospitals and other

20

providers are willing to offer discounts in exchange for benefits like being able to market and cross-sell their full range of medical services to the health plans' enrollees.  A market value that does not add a premium to account for the absence of the benefits of a contract, amici continue, is inadequate and creates a disincentive for health plans to form contracts in order to get lower rates.  We disagree.  The quantum meruit remedy by definition looks to the reasonable, market-based value of the services provided:  That value is calculated by looking at the "full range of fees" charged in the market (e.g., *Sanjiv Goel, M.D., Inc. v. Regal Medical Group Inc.* (2017) 11 Cal.App.5th 1054, 1060, 1062 (*Goel*)), and thus encompasses the lower rates grounded in contracts as well as the higher rates charged where no contract exists.  As a result, the quantum meruit remedy is not inadequate simply because it does not require the trier of fact to add a premium *across the board*.  More to the point, creating a tort remedy with the extensive drawbacks outlined above in order to fine-tune the complex market for health care services is, in any event, a bit like swatting a fly with Thor's hammer.  Such fine-tuning is better left to our Legislature.  (*Foley*, *supra*, 47 Cal.3d at p. 694 ["Significant policy judgments affecting social policies and commercial relationships" that "ha[ve] the potential to alter profoundly . . . the cost of products and services . . . is better suited for legislative decisionmaking"].)

Because we conclude that there is no legal duty not to negligently or intentionally underreimburse a hospital or other medical provider, the trial court properly dismissed the hospitals' intentional tort claim based on that duty's nonexistence.

21

**B.** *Unfair competition law*

"As its name suggests, California's unfair competition law bars 'unfair competition' and defines the term as a 'business act or practice' that is (1) 'fraudulent,' (2) 'unlawful', or (3) 'unfair.'" (*Shaeffer v. Califia Farms, LLC* (2020) 44 Cal.App.5th 1125, 1135 (*Shaeffer*), quoting Bus. & Prof. Code, § 17200; see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) "Each is its own independent ground for liability under the unfair competition law." (*Shaeffer*, at p. 1135; *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1196 (*Aryeh*) [noting independent "prong[s]"].)

Because a plaintiff states a claim under the unlawful prong of the unfair competition law by showing that the challenged practice violates a California "statute or regulation" (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1265 (*Gutierrez*); *Aryeh*, *supra*, 55 Cal.4th at p. 1196), a plaintiff may as a general matter state a claim under the unfair competition law for a violation of the Knox-Keene Act. (See *Bell*, *supra*, 131 Cal.App.4th at pp. 217, fn. 6, 221 & fn. 9 [unfair competition claim based on failure to reimburse under section 1371.4 viable]; *Coast Plaza Doctors Hospital v. UHP Healthcare* (2002) 105 Cal.App.4th 693, 699, 704-706 [same]; *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1134 [same], disapproved on another ground in *Centinela, supra*, 1 Cal.5th 994; *Northbay Healthcare Group - Hospital Div. v. Blue Shield of California Life & Health Insurance* (N.D.Cal. 2018) 342 F.Supp.3d 980, 986-987 (*Northbay*) [same]; see generally *California Medical Assn., Inc. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 169 [unfair competition claims based on "acts made unlawful

by Knox-Keene" Act viable]; *Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, 1250-1251 [same]; cf. *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1297-1299 [prior to enactment of section 1371.4, Knox-Keene Act did not require reimbursement, such that the failure to reimburse was "lawful on its face" and hence not actionable under unfair competition law); *Regents of the Univ. of California v. Global Excel Mgmt.* (C.D.Cal. Jan. 10, 2018, No. SA CV 16-0714-DOC (Ex)) 2018 U.S.Dist. Lexis 89413, p. *62 (*Regents*) [entering judgment declining relief under unfair competition law due to lack of proof].)

The unfair competition law affords two types of relief—namely, restitution and injunctive relief. (Bus. & Prof. Code, § 17203; *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950.) Of the two, injunctive relief is the "'primary form of relief.'" (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337). Relief does *not*, however, include *damages*, whether they be consequential or punitive. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1148; *Inline, Inc. v. Apace Moving Systems, Inc.* (2005) 125 Cal.App.4th 895, 904.)

As applied to a violation of the Knox-Keene Act's requirement for reimbursement of emergency medical services, the restitution available under the unfair competition law would be entirely duplicative. The hospitals may certainly seek restitution for Kaiser's violation of its Knox-Keene Act duty to reimburse them for the "reasonable and customary value" of the emergency medical services they provided to Kaiser enrollees, but that restitutionary award is indistinguishable from the award they would receive through their quantum meruit claim.

23

(*Hartford Casualty Ins. Co. v. J.R. Marking, L.L.C.* (2015) 61 Cal.4th 988, 996 [quantum meruit allows for "restitution"].)

What is more, the injunctive relief the hospitals seek—that is, an order enjoining Kaiser from violating the Knox-Keene Act by underpaying for emergency medical services in the future—is legally unavailable. To the extent it requires Kaiser more specifically not to underpay reimbursement when its enrollees receive emergency medical services in every future instance, it is difficult to see how Kaiser could comply: It is impossible for Kaiser to definitively know the "reasonable and customary value" of emergency medical services until a jury fixes that value, but Kaiser is statutorily obligated to pay *some* reimbursement amount within 30 or 45 days of rendering those services. If Kaiser incorrectly estimates the "reasonable and customary" value and underpays, it will have violated the injunction and will ostensibly be subject to contempt penalties. To us, such an injunction would be "'so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application'"; as such, it would be invalid and could not form the basis for the "potent weapon" of contempt. (*In re Berry* (1968) 68 Cal.2d 137, 156; *People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 316; see generally *People ex rel. Gascon v. HomeAdvisor, Inc.* (2020) 49 Cal.App.5th 1073, 1082 ["'An injunction must be sufficiently definite to provide a standard of conduct for those whose activities are to be proscribed . . .'"].) To the extent it requires Kaiser more generally to "obey the law," such an injunction would be equally invalid. (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 416 ["a court may not issue a broad injunction to simply obey the law . .

24

."]; *Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 752 [same].)

Thus, the trial court properly dismissed the hospitals' unfair competition claim to the extent it sought injunctive relief but erred in dismissing that claim to the extent it sought restitution.[9]  The latter error was harmless, however, given that the hospitals were able to effectively pursue restitution as part of their quantum meruit claim.  (Cf. *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 352 [where cause of action is duplicative of another cause of action in the complaint, it is "superfluous" and subject to summary adjudication].)

## III.    Propriety of the Jury Instruction Defining "Reasonable and Customary Value"

The hospitals and their amici level two different complaints at the trial court's jury instruction defining "reasonable and customary value."  We independently examine instructional issues.  (*People v. Scully* (2021) 11 Cal.5th 542, 592.)

### A.    *Pertinent facts*

In its initial instructions given prior to the presentation of evidence, the trial court instructed the jury that (1) it would be "asked to decide" the "reasonable value" of the emergency medical services the hospitals provided, (2) "reasonable value" is defined as "what a hypothetical buyer would have offered and what a hypothetical seller would have accepted" for those services, (3) in assessing reasonable value, the jury may "consider" (a) "all of the

_____

[9]     In light of this conclusion, we have no occasion to consider whether injunctive relief is also barred by the doctrine of judicial abstention.  (E.g., *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1297-1298; *Hambrick v. Healthcare Partners Medical Group, Inc.* (2015) 238 Cal.App.4th 124, 150.)

people in the market," and (b) "what" Kaiser and the hospitals "agreed on before" because "these folks are in the market," but that their prior agreements do not "dictate" the "reasonable value."

At the conclusion of trial, the court instructed the jury in pertinent part:

> "The measure of recovery in quantum meruit is the reasonable value of the services. Reasonable value is the price that a *hypothetical* willing buyer would pay a *hypothetical* willing seller for the services, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts. Reasonable value can be described as the 'going rate' for those services in the market.
>
> "In determining reasonable value, you should consider the full range of transactions presented to you, but you are not bound by them. You may choose to use the transactions you believe reflect the price that a *hypothetical* willing buyer would pay a *hypothetical* willing seller for the services. On the other hand, you may reject transactions you believe do not reflect the price that a hypothetical willing buyer would pay a hypothetical willing seller for the services."

(Italics added.)

## B. *Analysis*

The hospitals argue that the trial court erred in telling the jury to determine "reasonable value" by looking at what a "*hypothetical* willing buyer" would pay a "*hypothetical* seller" for the services. Amici, by contrast, argue that the trial court erred

26

in not telling the jury to give the parties' prior agreements greater—if not dispositive—weight in assessing that value. Neither argument has merit.

In *Children's Hospital*, *supra*, 226 Cal.App.4th 1260, the court held that the "reasonable and customary value" of reimbursement for emergency medical services under the Knox-Keene Act is pegged to the "[r]easonable" or "fair market value" of those services. (*Id.* at p. 1274.) *Children's Hospital* went on to define that value as "the price that "'a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts.'" [Citation.]" (*Ibid.*) As one would anticipate given the quantum meruit claim at issue, *Children's Hospital* borrowed its "reasonable market value" standard from the law of quantum meruit. (*Id.* at pp. 1274-1275.) That law looks to the "reasonable value of [the] services" in the "open market," and explicitly acknowledges that this value may be different than the price fixed by a prior contract between the parties to that case. (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 450 (*Maglica*).) The determination of reasonable value is to account for a "wide variety of evidence." (*Children's Hospital*, at p. 1274.)

Under this law, the trial court's reference to a "hypothetical buyer" and "hypothetical seller" was entirely appropriate. "Fair market value" is defined in many other contexts as that amount that "hypothetical buyers and sellers" would pay in a "hypothetical transaction." (*South Bay Irrigation Dist. v. California-American Water Co.* (1976) 61 Cal.App.3d 944, 976; *People v. Seals* (2017) 14 Cal.App.5th 1210, 1217; *Xerox Corp. v. County of Orange* (1977) 66 Cal.App.3d 746, 752-753; *County of San Diego v. Assessment Appeals Board No. 2* (1983) 140

27

Cal.App.3d 52, 57; *People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1083, fn. 15.)  This makes sense.  Where, as here, the reimbursement transactions at issue between the hospitals and Kaiser are *compelled* by the Knox-Keene Act and federal law, and where fair market value by definition looks to a fully *consensual* transaction, a determination of fair market value is necessarily hypothetical.  As a result, and contrary to what the hospitals strenuously urge, the absence of the word "hypothetical" in the definition of "reasonable value" set forth in *Children's Hospital* is of no consequence.

Not only is it legally appropriate to key "reasonable value" to the price fixed by a willing "hypothetical buyer" and willing "hypothetical seller" in a "hypothetical transaction," but it is affirmatively helpful because it emphasizes another pertinent legal principle—namely, that the parties' prior *actual* transactions are not dipositive.  (*Maglica*, *supra*, 66 Cal.App.4th at p. 450.)  For much the same reason, amici's argument that the prior transactions should be accorded extra weight—rather than be treated as one of the colors in the prism of the "wide variety of evidence" relevant to reasonable value—is legally incorrect.  (See *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1274.)

At oral argument, the hospitals articulated a new challenge to the instruction—namely, that the portion of the instruction allowing the jury to "reject transactions you believe do not reflect the price that a hypothetical willing buyer would pay a hypothetical willing seller for the services" improperly empowered the jury to capriciously disregard relevant evidence bearing on the "reasonable and customary value" of the services provided, and thereby undercut the earlier portion of the

28

instruction advising the jury to "consider the full range of transactions presented." We are unpersuaded. The discretion accorded by the jury to reject some transactions does no more than reflect the reality that some market transactions will more closely resemble the transactions at issue in the case before the jury, and some will bear less resemblance, and thus gives the jury the ability to give greater weight to the former and less weight to the latter in fixing what a hypothetical buyer and seller would pay for the specific services at issue in that case.

## IV. Propriety of Evidentiary Rulings

The hospitals and amici challenge the trial court's (1) limitation on their expert witness's testimony and (2) rulings regarding four categories of evidence bearing on the "reasonable and customary" value of the emergency medical services at issue in this case. We review evidentiary rulings for an abuse of discretion (*People v. Dworak* (2021) 11 Cal.5th 881, 895), but independently review any subsidiary questions of law (*Goel*, *supra*, 11 Cal.App.5th at p. 1060).

### A. *Limitation on expert opinion testimony*

#### 1. *Pertinent facts*

In accordance with the trial court's pretrial ruling, the hospitals' expert witness opined to the jury that the "reasonable and customary value" of the emergency medical services provided to Kaiser's enrollees should be fixed at 90 percent of the hospitals' full, billed rates. The expert calculated his 90 percent figure by taking the average of the following three percentages: (1) 83 percent, which represented the "course of dealing" between Kaiser and the hospitals, and was calculated by (a) taking the percentage from the parties' most recent contract (51 percent), (b) adding 15 percent to reflect that the hospitals, without a contract,

29

no longer received the contract-based rate of 51 percent for the subset of Kaiser enrollees who were also enrolled in Medicare (which reimburses at a much lower rate), and (c) adding another 15 percent to reflect that the hospitals, without a contract, did not receive any of the ancillary benefits (such as cross-marketing opportunities) that come with having a contract (the expert did not explain where the other two percent comes from); (2) 87 percent, which represented the most analogous "comparison" point, and was calculated by (a) taking the average percentage for rental network contracts (72 percent), and (b) adding an additional 15 percent to reflect that the hospitals, without an actual rental network contract, did not receive any of the ancillary benefits that come with having a contract; and (3) 100 percent, which represents the hospitals' full, billed rates, which was appropriate because the hospitals' billed rates are in the "lower third" of rates in the "region."

Partway through the expert's testimony, the trial court questioned the expert outside the jury's presence. After the expert was unable to answer several of the court's questions, the court ruled that the third percentage in the expert's calculation—that is, 100 percent for the hospitals' full, billed rate—must be excluded. The court cited three reasons for its ruling: (1) the expert could not explain why the hospitals' full, billed rate accounted for one-third of his calculation when only eight percent of the hospitals' clientele paid the full rate; (2) the expert did not show that the small percentage of transactions where the full, billed rate was paid had any resemblance to the transactions at issue here; and (3) the expert did not explain why the hospitals' full, billed rates being on the lower end of full, billed rates vis-à-

vis other hospitals made it appropriate to use that rate for one-third of his calculation.

When the jury returned, the court informed the jury that, after "a long discussion," "the court concluded that the third prong [regarding the full, billed rates] doesn't belong there." The expert then opined that the relevant percentage was 85 percent (that is, the average of the other two percentages—83 percent and 87 percent).

    2.    *Analysis*

A witness may testify as an expert if he possesses the requisite "special knowledge, skill, experience, training, or education," on any "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" if it is "[b]ased on a matter . . . perceived by or personally known to the [expert]" and "is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject . . . ." (Evid. Code, §§ 720, 801, subds. (a) & (b).) To enforce these requirements as well as those in Evidence Code section 802, a trial court must "act[] as a gatekeeper to exclude expert opinion testimony that is (1) based on a matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*).) As part of this responsibility, a trial court may exclude expert testimony if it concludes that "'there is simply too great an analytical gap between the data and the opinion offered.' [Citation.]" (*Id.* at p. 771.)

The trial court did not abuse it discretion in prohibiting the expert from relying upon the hospitals' full, billed rates as one-

31

third of his proffered calculation because the court's further inquiry revealed "too great an analytical gap between the data and the opinion [he] offered." Despite many opportunities to do so, the expert was unable to explain why it made "logic[al]" or "rational" sense to treat the hospitals full, billed rate as one of three ingredients going into the reasonable value of the hospitals' services when very few patrons actually paid that full rate, when there was no showing that those patrons' transactions were in any way similar to the transactions at issue in this case, and when the expert could not explain why the relative low amount of the hospitals' full, billed rates justified treating those rates as one of three ingredients.

The hospitals respond with three arguments.

First, they argue that their full, billed rates are relevant. This is true, but beside the point. The issue here is not whether they are *relevant*, but whether the expert offered any rational reason for giving the full, billed rate such prominence in his calculation. He did not, and this was "too great a . . . gap" in his analysis.

Second, the hospitals assert that the trial court went beyond the gatekeeper role approved by *Sargon, supra*, 55 Cal.4th at pp. 771-772, because (1) the three bases *Sargon* articulated for excluding expert testimony do not include exclusion for expert testimony with analytical gaps, and (2) the trial court merely disagreed with their expert's conclusions, which is an impermissible basis for excluding testimony under *Sargon*. These assertions lack merit. There is no question that *Sargon* expressly empowered a trial court to exclude expert testimony whenever "there is simply too great an analytical gap between the data and the opinion offered.' [Citation.]" (*Id.* at p.

32

771.) We reject the hospitals' argument that our Supreme Court did not mean what it said. Further, the trial court in this case did not disagree with the expert's conclusion; instead, the court excluded the evidence because the expert could not explain the part of his "'methodology'" that the court excluded, which is precisely what *Sargon* contemplates. (*Id.* at p. 772 ["the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate' [citation]"].)

Third, the hospitals contend that the trial court exuded "palpable" "hostility" toward their expert, which they imply taints the court's evidentiary rulings and otherwise prejudiced the hospitals. This contention finds no support whatsoever in the record. To be sure, the court told the expert to remain on the stand as the court excused the jury in order to probe the basis for the expert's opinion, vigorously examined the expert regarding the reasons for treating the full, billed rate as one-third of his calculation, and ultimately told the jury that it had ruled that the full, billed rate "doesn't belong there." But this conduct confirms that the trial court was merely doing what *Sargon* requires— namely, acting as a gatekeeper to ensure that the trier of fact is not presented with expert testimony based on logically unsupported methodologies. The court's conduct, as well as its demeanor in undertaking that conduct, was nowhere near the type of "persistent[]" "discourteous and disparaging remarks" aimed at "discredit[ing]" one party that crosses over the line into judicial misconduct. (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206-1207.)

33

**B.** *Exclusion of categories of evidence bearing on "reasonable and customary value"*

The hospitals and their amici argue that the trial court erred in excluding from the jury's consideration four "relevant data point[s]" bearing on the "reasonable and customary value" of the emergency medical services the hospitals provided: (1) what Kaiser paid other hospitals for emergency medical services, (2) the hospitals' full, billed rates, (3) what Kaiser received when its affiliated hospitals provided emergency medical services to the hospitals' enrollees (because the hospitals self-insured their employees), and (4) what methodology Kaiser used internally to calculate the "reasonable and customary" value it would pay the hospitals for emergency medical services.[10]

We reject the first two challenges at the outset for the simple reason that the trial court never excluded those "data point[s]." Although the trial court did not allow the hospitals' expert to discuss what Kaiser paid other hospitals for emergency medical services because those rates were not part of the expert's methodology or opinion, the contracts setting forth those payments were admitted into evidence. The court also admitted evidence of what percentage of the hospitals' full, billed rates

---

**10** The hospitals repeatedly assert that Kaiser's internal methodology *changed* "overnight" because Kaiser's reimbursement amounts dropped significantly when Kaiser went from participating in a rental network to making payments based on its methodology. On these facts, however, the drop reflects a shift from one external methodology for paying (that is, the rental networks' contract rates) to an internal methodology—not from one internal methodology to another. Thus, the evidence at trial does not support the notion that Kaiser altered its internal methodology to reduce reimbursement amounts.

34

various entities paid for services as well as the dollar amount corresponding with 85 percent of those full, billed rates; from these, the jury could calculate the rates themselves. The absence of the rates themselves is hardly surprising, as *the hospitals* repeatedly told the trial court that they preferred the evidence to be presented as "a percentage of the full, billed rates" rather than with the rates themselves.

We now turn to the two categories of evidence that were excluded.

### 1. *Pertinent facts*

#### a. The hospitals' payments to Kaiser

During the direct examination of one of the hospitals' vice presidents, the hospital asked if there were "situations in which [the hospitals are] the party who pays Kaiser for emergency trauma services." When the vice president answered that such situations exist because the hospitals "self-insure[] [their] employees," the trial court said, "Oh, no. Move on."

#### b. Kaiser's internal methodology

In two different motions in limine, Kaiser moved to exclude evidence of its internal methodology on the grounds that it was both irrelevant and subject to exclusion under Evidence Code section 352 due to any probative value being substantially outweighed by undue consumption of time, by danger of confusing the jury, and by undue prejudice. The trial court deferred ruling until trial. In the midst of trial, however, the court excluded any evidence of Kaiser's internal methodology on two mutually reinforcing grounds: (1) what Kaiser offered to pay—and its internal deliberations regarding how to come up with that offer—was "really irrelevant," and (2) even if Kaiser's methodology was relevant, a single "market participant's

35

subjective view of value without knowing whether or not it would be accepted," had only "marginal" relevance that was "substantially outweighed" (a) "by the risk" of confusing the jury, when that "reasonable value" issue is to be adjudged objectively, and (b) by the risk that the jury might misuse evidence bearing on Kaiser's subjective intent to paint Kaiser's staff as "awful people trying to do underhanded things," when Kaiser's motive is not "material" to the sole question of reasonable value at issue in the case. Curiously, the hospitals told the trial court that they *agreed* that Kaiser's subjective motive was irrelevant.

2. *Analysis*

Evidence is "relevant" if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Sanchez* (2019) 7 Cal.5th 14, 54.) Even if an item of evidence is relevant, a trial court has "broad discretion" to "exclude" that item "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) A trial court may raise and sustain its own objection to evidence under Evidence Code section 352. (E.g., *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 581.)

a. The hospitals' payments to Kaiser

The trial court did not abuse its discretion in excluding evidence of what the hospitals (in their role as self-insurers of their employees) paid Kaiser for emergency medical services for two reasons.

36

First, this evidence was properly excluded under Evidence Code section 352. To be sure, this evidence is relevant. It is well settled that "any evidence bearing upon the 'reasonable market value' of" emergency medical services is "relevant," including "the full range of fees" charged and paid in the market. (*Goel*, *supra*, 11 Cal.App.5th at pp. 1060, 1063; *Children's Hospital*, *supra*, 226 Cal.App.4th at pp. 1274, 1277; *Northbay Healthcare Group - Hospital Div. v. Blue Shield of California Life & Health Ins.* (N.D.Cal. Apr. 2, 2019, No. 17-cv-02929-WHO) 2019 U.S.Dist. Lexis 227356, p. *3; *Regents*, *supra*, 2018 U.S.Dist. Lexis 89413, at p. *55). The amount that the hospitals paid Kaiser for emergency services certainly fits within this definition because it is a transaction for emergency medical services in the pertinent market. But, as the trial court elsewhere noted, the hospitals and Kaiser are just a very small subset of participants in that market. "Cherry-picking" and placing undue focus on transactions involving those two participants, the trial court feared, would risk presenting the jury with a "skewed market" when the law requires an evaluation of the "*full* range of fees" charged and paid in the market. The extent of this skew may have been ever greater if, as the hospitals argued, Kaiser was "unique" in that market as both a medical insurance provider and a hospital operator. As noted above, Evidence Code section 352 grants a trial court the power to exclude evidence where, as here, its probative value is substantially outweighed by the substantial danger of confusing the issues or misleading the jury. That the trial court did not articulate any specific basis for its exclusion of this evidence is of no consequence because we review the court's ruling, not its reasoning. (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1516.)

Second, even if the trial court erred, the hospitals have not demonstrated that they were prejudiced by this error because they never proffered to the trial court the rate at which the hospitals reimbursed Kaiser for the emergency medical services. (*People v. Anderson* (2001) 25 Cal.4th 543, 580 ["the reviewing court must know the substance of the excluded evidence in order to assess prejudice"]; see also Evid. Code, § 354.) Without knowing whether that rate is higher or lower than the rate at which Kaiser paid the hospitals in this case, the hospitals cannot carry their burden of proving that a different outcome was reasonably probable had this evidence been admitted. (*People v. Masters* (2016) 62 Cal.4th 1019, 1064 (*Masters*).)

The hospitals' sole argument on appeal is that evidence of what they paid Kaiser is relevant. As explained above, we agree with the hospitals on this point but nevertheless conclude there was no abuse of discretion to exclude the evidence under Evidence Code section 352, a provision the hospitals did not address in their briefs on appeal. To the extent the hospitals are asserting that the general mandate that the trier of fact fixing the "reasonable and customary value" of emergency medical services must consider a "wide variety of evidence" *overrides* a trial court's discretion to exclude specific pieces of evidence under Evidence Code section 352, we reject that assertion both because this non-constitutionally-based case law cannot wipe away our Legislature's statutory grant of discretion and because this mandate is not absolute in any event: The pertinent cases acknowledge that "[s]pecific criteria might or might not be appropriate for a given set of facts" (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1275), such that the mandate "leaves considerable discretion to trial courts to determine what billing

38

and payment evidence might be relevant to a particular case" (*Goel*, *supra*, 11 Cal.App.5th at p. 1060, fn. 3).

      b. Kaiser's internal methodology

 The trial court did not abuse its discretion in excluding evidence of Kaiser's internal methodology for calculating its reimbursement payments to the hospitals. We need not address whether a health plan's internal methodology is relevant in the first place because, assuming its base relevance, the trial court acted within its discretion in excluding the evidence under Evidence Code section 352 because (1) a health plan's subjective view of the value as to what it should offer for a hospital's or other medical provider's emergency medical services is of marginal relevance to the question of what the value of those services are in the market, which is a function of what price is offered *and accepted* (e.g., *Northbay*, *supra*, 342 F. Supp. 3d at p. 987 [what matters is "not the methodology," but rather "the results of a value determination—the reasonable reimbursements and the amount paid"]), and (2) that marginal relevance is substantially outweighed by the dangers that a jury might give the plan's subjective view more weight than it deserves and that the jury might punish the plan for its subjective parsimoniousness. Even *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1278, acknowledges that "subjective" criteria such as "costs" are of little relevance to the issue of reasonable value. What is more, the marginal relevance of Kaiser's internal methodology to the question of reasonable value means that its exclusion was not reasonably probable to alter the jury's assessment of that value. (*Masters*, *supra*, 62 Cal.4th at p. 1064.)

## V.    Propriety of Denial of Costs

In its cross-appeal, Kaiser argues that the trial court erred in flatly denying its motion for costs, seemingly on the ground that Kaiser was not the "prevailing party" because its failure to prevail on its cross-complaint for overpayment canceled out its victory in defending against the hospitals' claims. We independently review whether a party is entitled to costs as a matter of right (*Charton v. Harkey* (2016) 247 Cal.App.4th 730, 739), and conclude that the trial court erred.

The statute governing costs expressly specifies that a "defendant" is a prevailing party entitled to costs "where neither plaintiff nor defendant obtains any relief." (Code Civ. Proc., § 1032, subd. (a)(4); *Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 438.) As the hospitals concede, this language perfectly describes Kaiser in this case. The hospitals invite us to fashion a special exception to this statutory mandate just for cases adjudicating the "reasonable and customary value" of emergency medical services under the Knox-Keene Act, but this is an invitation we must decline because it is not our role to rewrite statutes. (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956.) Because the trial court's categorical ruling obviated the need for the court to consider the hospitals' multifarious objections to specific cost items requested by Kaiser, we reverse the order denying costs and remand the proceeding on the hospitals' motion to strike or tax Kaiser's costs to the trial court to consider the hospitals' objections in the first instance. (E.g., *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 887.)

40

## DISPOSITION

The judgment is affirmed. The order denying costs is reversed and remanded for the trial court to consider the hospitals' previously raised objections to specific cost items. Kaiser and Kaiser Foundation Hospitals are entitled to their costs on the appeal and cross-appeal.

## **CERTIFIED FOR PARTIAL PUBLICATION**.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ


41